SYLLABUS

This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court. In the interest of brevity, portions of an opinion may not have been summarized.

**State v. Donnell Gideon** (A-31-19) (083178)

**Argued September 14, 2020 -- Decided January 14, 2021**

**SOLOMON, J., writing for the Court.**

In this appeal, the Court considers whether trial counsel's failure to call as alibi witnesses defendant Donnell Gideon's mother, Bianca Gideon-Nichols, and/or girlfriend, Sahleeha Bey, prejudiced Gideon's case within the meaning of Strickland v. Washington, 466 U.S. 668, 694 (1984), warranting a new trial.

Gideon was arrested after being implicated by an eyewitness, Vincent Robinson, in a July 2004 shooting in Camden. On the day of his arrest, Gideon provided police officers with a statement. Gideon told the officers that he had fought with Tony Alford earlier on the day of the shooting, after Alford allegedly robbed individuals who sold drugs for Gideon. After the fight, Gideon walked home and, before arriving, was stopped by Alford, who was driving by. Alford told Gideon "it ain't over," which Gideon interpreted as a threat. Upon arriving home, Gideon called Eric Jackman. Jackman, Gideon, and a third man rode in Jackman's car, looking for Alford. Believing they saw him, they parked and entered an alley. Gideon then heard gunshots.

At trial in 2007, the State played the audio recording of Gideon's statement to police and offered the testimony of Robinson, who said he saw Gideon and two others wearing black and armed, standing in the alley at the time of the shooting.

Gideon testified that police "told [him] what to say" during his initial statement. In contrast to that statement, Gideon testified that, before arriving home, he saw his mother, Gideon-Nichols, who drove Gideon back to the scene of the fight to make peace with Alford and shake hands, then drove Gideon home and went to work. On cross-examination, Gideon testified for the first time that he remained home through the night with his girlfriend, Bey. Gideon-Nichols and Bey were present at Gideon's trial but did not testify. Gideon was convicted on multiple counts. Five years later, Gideon filed a petition seeking post-conviction relief (PCR), alleging ineffective assistance of counsel for failure to investigate and call Gideon-Nichols and Bey as alibi witnesses.

In a December 2012 certification in support of Gideon's petition, Gideon-Nichols attested that she drove Bey to the scene of the fight and found Gideon and Alford

1

scratched up and bleeding; the two men then shook hands. She stated that Alford departed while Gideon-Nichols, Bey, and Gideon drove to the store to pick up food, ate together at home, and stayed with each other through the night. Bey produced a similar certification, stating that she and Gideon-Nichols drove to the scene of the fight and that the three stayed home together through the night.

The PCR court denied Gideon's petition, noting that, were Gideon-Nichols and Bey to have testified, both would have contradicted Gideon's trial testimony. The Appellate Division remanded for an evidentiary hearing. At the hearing, Gideon-Nichols and Bey testified. The PCR court found neither credible and noted that their testimony was inconsistent with Gideon's trial testimony. The PCR court nevertheless granted Gideon's petition. The State appealed, and the Appellate Division reversed and remanded for determination of whether Gideon was prejudiced by counsel's deficiencies. The PCR court concluded that he was not. The Appellate Division reversed, vacated Gideon's conviction, and remanded for a new trial, relying in large part on State v. Pierre, 223 N.J. 560 (2015). The Court granted certification. 240 N.J. 197 (2019).

**HELD:** Pierre applied existing jurisprudence to a specific set of facts. At a PCR hearing, an alibi witness's false or inaccurate testimony may bear upon the witness's credibility and, while not dispositive, the claimed alibi witness's credibility must be weighed against the strength of the evidence presented at trial and offered post-conviction. Here, considering the strength of the State's case and the weakness of Gideon's alibi -- including the extent to which his proposed witnesses would have contradicted his own account of the relevant events -- the PCR court's finding that Gideon failed to demonstrate prejudice should not have been disturbed.

1. In Strickland, the United States Supreme Court set forth a standard for determining whether an attorney's inadequacy deprived a defendant of the level of assistance guaranteed by the Constitution, warranting reversal of a conviction. The Supreme Court of New Jersey Court has applied the Strickland standard to claims of ineffective assistance brought under the State Constitution. That standard has two prongs. First, the defendant must show that counsel's performance was deficient. Second, the defendant must have been prejudiced by counsel's deficient performance. Under the prejudice prong, the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. That is an exacting standard. (pp. 14-16)

2. The Court reviews two particularly instructive cases: State v. Allegro, 193 N.J. 352 (2008), and Pierre. In Allegro, the Court found that the defendant was not prejudiced by defense counsel's failure to call proposed alibi witnesses because the content of their testimony would not have "directly or tangentially address[ed] the State's proofs" that the defendant was solely responsible for the marijuana-growing operation for which he was convicted, and because the "belatedly tendered" additional witnesses would have

2

contradicted the trial witnesses and therefore could have been harmful to defendant at trial. 193 N.J. at 370. In Pierre, the defendant asserted an alibi defense to charges relating to an early-morning shooting in New Jersey -- he alleged that he was traveling to Florida to visit family at the time of the shooting. 223 N.J. at 567, 569-70. In support of that alibi, the defense offered both a speeding ticket issued in South Carolina several hours before the shooting and a phone bill and related testimony from the defendant's girlfriend showing that she had received a call from South Carolina not long before the shooting. Id. at 569. The Court found counsel's failure to pursue defendant's alibi defense prejudicial, particularly because the State's proofs against the defendant were limited. Id. at 584-88. (pp. 16-24)

3. Applying those principles to this case, the Court begins by considering the strength of the State's evidence. Here, in contrast to Pierre, there was more evidence against Gideon, notably his own statement to police and Robinson's testimony. And, against those stronger proofs, Gideon has offered a markedly weaker alibi defense. Unlike the defendant in Pierre, Gideon did not provide at trial, nor does he provide now, any physical evidence supporting his alibi. Rather, the proposed testimony of Gideon-Nichols and Bey constitutes Gideon's alibi. It is therefore particularly significant that their testimony would have contradicted important aspects of Gideon's trial testimony, including who he was with at the time of the shooting. Here, the PCR court found, and the Court agrees, that the testimony of either Gideon-Nichols or Bey "if anything would have increased the likelihood of conviction based upon th[e] discrepancies." In addition to those discrepancies, the PCR court noted factors that undermined Gideon-Nichols's credibility. Presenting Bey alone would still have created an inconsistency with Gideon's trial testimony, in addition to the credibility issue raised by Bey's failure to come forward in support of Gideon's alibi until roughly five years after his trial. (pp. 24-29)

4. Pierre does not suggest that failure to offer alibi testimony can be deemed prejudicial -- regardless of adverse credibility determinations -- if the testimony would have bolstered the defendant's alibi "on the fundamental point" of the defendant's whereabouts at the time of the crime. Such reasoning would require a new trial whenever a third party -- no matter how incredible -- asserts that a defendant was elsewhere at the time of a crime. The Court has never so weakened the standard for demonstrating prejudice. The prejudice prong of Strickland remains an exacting standard, and important to that analysis is the strength of the evidence before the fact-finder. On these facts, the PCR court's finding that Gideon failed to demonstrate prejudice should not have been disturbed. In reaching that conclusion, the Court defers to the PCR court's credibility determinations, which find sufficient credible support in the record. (pp. 29-30)

**REVERSED. The order denying Gideon's petition is REINSTATED.**

**CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA, ALBIN, PATTERSON, FERNANDEZ-VINA, and PIERRE-LOUIS join in JUSTICE SOLOMON'S opinion.**

SUPREME COURT OF NEW JERSEY

A-31 September Term 2019

083178

State of New Jersey,

Plaintiff-Appellant,

v.

Donnell Gideon,

Defendant-Respondent.

On certification to the Superior Court,
Appellate Division.

| Argued | Decided |
|---|---|
| September 14, 2020 | January 14, 2021 |

Linda A. Shashoua, Special Deputy Attorney
General/Acting Assistant Prosecutor, argued the cause for
appellant (Jill S. Mayer, Acting Camden County
Prosecutor, attorney; Linda A. Shashoua, of counsel and
on the briefs).

Alan Dexter Bowman argued the cause for respondent
(Alan Dexter Bowman, on the briefs).

Steven A. Yomtov, Deputy Attorney General, argued the
cause for amicus curiae Attorney General of New Jersey
(Gurbir S. Grewal, Attorney General, attorney; Steven A.
Yomtov, of counsel and on the brief).

JUSTICE SOLOMON delivered the opinion of the Court.

1

After being arrested in connection with a shooting in Camden that resulted in the death of one individual and injuries to three others, defendant Donnell Gideon implicated himself in a statement to police. At trial, Gideon recanted his statement to police and, for the first time, offered a potential alibi defense during cross-examination. After his conviction and unsuccessful appeals, Gideon claimed in a petition for post-conviction relief (PCR) that counsel was ineffective for not investigating or presenting the alibi testimony of his mother, Bianca Gideon-Nichols, and girlfriend, Sahleeha Bey. Although the PCR court concluded that both witnesses were incredible and contradicted Gideon's trial testimony, the Appellate Division, relying upon this Court's decision in State v. Pierre, 223 N.J. 560 (2015), reversed.

In this appeal, we are called upon to determine whether trial counsel's failure to call Gideon-Nichols and/or Bey as alibi witnesses prejudiced Gideon's case within the meaning of Strickland v. Washington, 466 U.S. 668, 694 (1984), warranting a new trial. We determine that it did not and therefore reverse the Appellate Division's judgment. In doing so, we make clear that Pierre applied our existing jurisprudence to a specific set of facts. At a PCR hearing, an alibi witness's false or inaccurate testimony may bear upon the witness's credibility and, while not dispositive, the claimed alibi witness's credibility must be weighed against the strength of the evidence presented at trial and offered post-conviction.

2

I.

A.

The trial, appellate, and PCR records reveal that a July 2004 shooting in the Yorkship Square section of Camden left one person dead and three others wounded. The victims were all bystanders with no connection to the dispute that led to the shooting. Gideon was arrested over a month later after being implicated by an eyewitness, Vincent Robinson, and was charged with murder and aggravated assault, among other offenses, in connection with the shooting. On the day of his arrest, Gideon provided police officers with a statement.

Gideon told the officers that he had fought with Tony Alford earlier on the day of the shooting, after Alford allegedly robbed individuals who sold drugs for Gideon. After the fight, Gideon walked home and, before arriving, was stopped by Alford, who was driving by. Alford told Gideon "it ain't over," which Gideon interpreted as a threat. Upon arriving home, Gideon called Eric Jackman, for whom Gideon served as a middleman in Jackman's drug operation. Jackman arrived at Gideon's home after dark and instructed Gideon to put on black clothing. Gideon understood that they were preparing to "handle the situation from earlier."

Gideon sat in the back of Jackman's car as a third man, whom Gideon did not recognize, sat in the front passenger seat. Gideon described to police the route taken as the three looked for Alford, referencing specific streets and landmarks.

After believing that they saw Alford, the three parked. Gideon noticed that Jackman was carrying an AK-47 rifle and the third man was carrying a Mossberg shotgun. The three entered an alley and, when Gideon asked what was going on, Jackman said, "[c]hill, just look up." Gideon then heard "a lot" of gunshots and the three fled to the car. Jackman and the third man stored the guns in a shed behind an abandoned house. Gideon understood that the guns were to be disposed of and melted down.

Gideon was later indicted on fifteen counts for offenses including murder, attempted murder, conspiracy to commit murder, and aggravated assault, as well as weapons charges.

At trial in 2007, the State played the audio recording of Gideon's statement to police and offered the testimony of Robinson, a local drug dealer and former classmate of Gideon's. Robinson testified that he saw Gideon and two others wearing black and armed with a "long gun" standing in the alley at the time of the shooting.

Gideon testified that police "told [him] what to say" during his initial statement and that he was under the influence of alcohol and marijuana at the time. He testified that he was bicycling home after his fight with Alford when Alford drove by and stopped him. In contrast to his initial statement, Gideon testified that their exchange was non-threatening.

4

Gideon further testified that, before arriving home, he saw his mother, Gideon-Nichols, who asked why he had been fighting. Gideon-Nichols drove Gideon back to the scene of the fight to make peace with Alford and shake hands. Gideon testified that Gideon-Nichols then drove him home and went to work. On cross-examination, Gideon testified for the first time that he remained home through the night with his girlfriend, Bey. Gideon-Nichols and Bey were present at Gideon's trial but did not testify.

Alford testified that he caught up with Gideon while the latter was on his way home after their fight and that Gideon returned with Gideon-Nichols to the scene of the fight so that he and Gideon could shake hands. He stated that, after shaking hands with Gideon, he went to his girlfriend's home in Somerdale and was not present at the shooting.

The jury convicted Gideon of aggravated manslaughter, N.J.S.A. 2C:11-4(a), as a lesser-included offense of murder; attempted murder, N.J.S.A. 2C:5-1 and N.J.S.A. 2C:11-3(a); multiple counts of aggravated assault, N.J.S.A. 2C:12-1(b)(1); conspiracy to commit murder, N.J.S.A. 2C:5-2 and N.J.S.A. 2C:11-3; possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a); and unlawful possession of an assault firearm, N.J.S.A. 2C:39-5(f). He was sentenced to an aggregate twenty-seven-year prison term subject to the No Early Release Act,

N.J.S.A. 2C:43-7.2(a). The conviction was affirmed on direct appeal, and we denied certification.

B.

Five years after his conviction, Gideon filed a PCR petition alleging, as relevant here, ineffective assistance of counsel for failure to investigate and call Gideon-Nichols and Bey as alibi witnesses.

In a December 2012 certification in support of Gideon's petition, Gideon-Nichols attested that she received several calls on the day of the shooting that Gideon was in a fight. She stated that she then drove Bey, who was pregnant with Gideon's child, to the scene of the fight and found Gideon and Alford scratched up and bleeding. Gideon-Nichols certified that she asked if the fight was over, Alford responded that it was, and Alford and Gideon shook hands. She stated that Alford then departed on a bicycle while Gideon-Nichols, Bey, and Gideon drove to the store to pick up food, ate together at home, and stayed with each other through the night as Bey was very ill. Gideon-Nichols certified that she told trial counsel that she could provide an alibi and that she confronted counsel about testifying at trial.

Bey produced a similar certification, stating that she and Gideon-Nichols drove to the scene of the fight and that the three stayed home together through the night. Both Bey and Gideon-Nichols's certifications placed the date of the shooting in 2007 rather than 2004.

6

The PCR court denied Gideon's petition, finding that it was a strategic decision to not call Gideon-Nichols or Bey as witnesses. The court noted that, were they to have testified, both would have contradicted Gideon's trial testimony. For instance, Gideon-Nichols and Bey certified that the three stayed home together on the night of the shooting, while Gideon testified that Gideon-Nichols went to work after dropping him off at home. Gideon-Nichols and Bey also attested that they drove to the scene of the fight to find Gideon, while Gideon testified that he met Gideon-Nichols on his way home.

The Appellate Division found that Gideon presented a prima facie ineffective assistance claim and remanded for an evidentiary hearing. Of utmost importance to the Appellate Division was the fact that Bey supported Gideon's trial testimony that he was with her through the evening.

## C.

At the evidentiary hearing on remand, Gideon-Nichols repeated much of what she had stated in her certification. She testified that she received multiple calls that Gideon was in a fight and drove to the scene with Bey; that Gideon and Alford shook hands; and that she, Bey, and Gideon then picked up food and went home. Gideon-Nichols stated that although she was supposed to go to work, she did not. She testified that, after cooking and eating, the three watched movies

7

together all night.  Gideon-Nichols also stated that she informed trial counsel on multiple occasions that she could provide alibi testimony.

Bey testified similarly that after driving to Gideon and watching him shake hands with Alford, she, Gideon-Nichols, and Gideon picked up food.  She said that after arriving home, the three ate dinner and watched a "Law & Order" marathon. Bey testified that she became ill several times during the night and that Gideon did not leave the house.

Trial counsel testified that he did not recall Gideon identifying any alibi witnesses or Gideon-Nichols offering alibi testimony.  Had she done so, counsel said, he would have called her to testify at trial.  Trial counsel further clarified that his decision not to call Gideon-Nichols or Bey was not strategic because he did not know that they would provide alibi testimony.

The PCR court found neither Gideon-Nichols nor Bey credible.  The PCR court highlighted Gideon-Nichols's bias stemming from her love for her son and that her testimony seemed "rehearsed."  Her credibility was further undermined by a 1993 drug-possession conviction and probation violation.  The court found, as a fact, that Gideon-Nichols never approached trial counsel to offer testimony. Finally, the court identified inconsistencies between her hearing testimony and Gideon's trial testimony, namely that Gideon-Nichols testified to driving to the scene of the fight and staying with Gideon and Bey through the night, while

8

Gideon testified that he saw Gideon-Nichols on his way home and that she dropped him off at home and went to work.

Bey, as the mother of Gideon's child, was found similarly incredible. The court noted that she too testified that she drove with Gideon-Nichols to the scene of the fight and that Gideon-Nichols stayed with them through the night, which were inconsistent with Gideon's trial testimony.

Notwithstanding those findings, the court granted Gideon's petition, concluding that trial counsel had a continuing duty to investigate potential alibi evidence following Gideon's cross-examination and that his performance was deficient in light of his failure to do so. The State appealed.

The Appellate Division again reversed and remanded for further findings as to whether Gideon was prejudiced by counsel's deficiencies.

D.

The second remand tasked the PCR court solely with determining whether Gideon was prejudiced by trial counsel's deficient performance. The PCR court found that Gideon premised his defense on a claim that he was at home at the time of the shooting after Gideon-Nichols picked him up, brought him back to Alford to make peace, and then dropped him off at home. The court found that Gideon-Nichols and Bey would have contradicted Gideon's trial testimony and, "if anything[,] would have increased the likelihood of conviction based upon th[e]

9

discrepancies."  The court therefore found that counsel's deficiencies did not prejudice Gideon and denied Gideon's petition and motion for reconsideration.

The Appellate Division reversed, vacated Gideon's conviction, and remanded for a new trial, relying in large part on our decision in Pierre.  The Appellate Division read Pierre to establish two principles:  first, that the strength of the evidence supporting the verdict is integral to determining prejudice under Strickland; and second, that an alibi witness need not be wholly trustworthy in order to establish prejudice.  The Appellate Division interpreted our reference in Pierre to the "fundamental points" of a witness's testimony to mean that "the gravamen of the witness' testimony can be a more important circumstance than a consideration of the witness' credibility issues."  The Appellate Division interpreted Pierre to require that the court "pay close attention to the portions of the potential testimony that relate directly to the critical question as to [Gideon's] whereabouts" rather than "focus on non-fundamental matters that . . . do not pertain directly to the central tenet of the alibi defense."

Regarding the strength of the evidence supporting the verdict, the Appellate Division noted the absence of objective proof such as surveillance footage or global position system (GPS) data in the State's case against Gideon.  The court reasoned that aside from Gideon's statement to police, the only direct evidence

10

implicating Gideon was the corroborating testimony of Robinson, who -- among other credibility concerns -- had a personal relationship with Alford.

As to the second purported principle of Pierre -- that an alibi witness need not be wholly trustworthy -- the Appellate Division found that the contradictions in the testimony of Gideon, Gideon-Nichols, and Bey were relevant to their credibility but did not alter the "fundamental point" of "their common assertions that [Gideon] went home after the fistfight and ensuing reconciliation, and remained at home throughout the night." According to the court, many of the discrepancies were not fundamental or directly contradictory on that point. For instance, Gideon-Nichols and Bey testified that the three picked up food on the way home, which was an additional detail absent from -- but not wholly contradictory to -- Gideon's trial testimony. The "far more significant" discrepancy as to whether Gideon-Nichols went to work or stayed home with Gideon and Bey bore only on Gideon-Nichols's ability to establish Gideon's alibi and did not impugn Bey, in the court's view.

Bey's testimony could have been invaluable to Gideon on its own, according to the Appellate Division, and she did not possess any of the credibility flaws burdening Gideon-Nichols. Noting that the jury may have ultimately found Bey unconvincing, the Appellate Division nevertheless reversed the PCR court's decision, concluding that Bey's testimony would have strengthened Gideon's alibi

11

"if the jury believed her on the fundamental point that [Gideon] was home with her that entire night."

We granted the State's petition for certification. 240 N.J. 197 (2019). We also granted leave to the Attorney General to appear as amicus curiae.

## II.

The State asserts that the Appellate Division "unduly expanded" the "strength-of-evidence benchmark set forth in Pierre" and emphasizes the quantity and quality of evidence presented against Gideon at trial, including Gideon's own statement to police, corroborating eyewitness testimony, and the earlier fight with Alford -- which served as motive for the shooting. Distinguishing the present case from Pierre, the State stresses that the proposed witnesses would have contradicted Gideon's own testimony.

The State argues further that the Appellate Division exceeded its role by "cherry-pick[ing] from [Gideon's] proffer, disregard[ing] the credibility assessments made by the PCR court, and ignor[ing] the full context of the evidence." Isolating portions of a witness's testimony while disregarding those harmful to the witness's credibility, according to the State, fails to afford appropriate deference to the PCR court's factual findings.

The Attorney General largely echoes the State's arguments. Unlike in Pierre, the Attorney General notes, Gideon did not file a notice of alibi and the

State had at its disposal a corroborated confession from Gideon. And, by not deferring to the credibility findings of the PCR court, the Attorney General argues that the Appellate Division "effectively created a paradigm where prejudice can be established in virtually any case which is not supported by overwhelming evidence of guilt."

Gideon, on the other hand, maintains that a fully developed alibi defense would have changed the outcome of his case. He emphasizes that the strength of alibi testimony is not measured by whether a PCR court would decide to acquit, but rather whether the jury may have believed the testimony. In this regard, Gideon asserts that the "State ha[d] no antidote to the testimony" of Bey, who would have supported his claim that he was at home at the time of the shooting.

## III.

## A.

In his PCR petition, Gideon asserts that his conviction must be overturned in light of his trial counsel's failure to investigate and call Gideon-Nichols and/or Bey as alibi witnesses. A PCR petition is cognizable if it is based upon a "[s]ubstantial denial in the conviction proceedings of defendant's rights under the Constitution of the United States or the Constitution or laws of the State of New Jersey." R. 3:22-2(a).

Those accused in criminal proceedings are guaranteed the right to counsel to assist in their defense. U.S. Const. amend. VI; N.J. Const. art. I, ¶ 10. "The right to counsel plays a crucial role in the adversarial system embodied in the Sixth Amendment, since access to counsel's skill and knowledge is necessary to accord defendants the 'ample opportunity to meet the case of the prosecution' to which they are entitled." Strickland, 466 U.S. at 685 (quoting Adams v. United States ex rel. McCann, 317 U.S. 269, 275 (1942)); see also Pierre, 223 N.J. at 577. To satisfy the right to counsel guaranteed by our Federal and State Constitutions, it is not enough "[t]hat a person who happens to be a lawyer is present at trial alongside the accused," Strickland, 466 U.S. at 685; rather, the right to counsel has been interpreted by the United States Supreme Court and this Court as "the right to the effective assistance of counsel." Id. at 686; see also State v. Fritz, 105 N.J. 42, 57 (1987).

In Strickland, the United States Supreme Court set forth a standard for determining whether an attorney's inadequacy deprived a defendant of the level of assistance guaranteed by the Constitution. See 466 U.S. at 687; see also State v. Preciose, 129 N.J. 451, 463-64 (1992). This Court has applied the Strickland standard to claims of ineffective assistance brought under Article I, Paragraph 10 of the New Jersey Constitution. Fritz, 105 N.J. at 58; see also State v. Porter, 216 N.J. 343, 352 (2013). The standard for an ineffective assistance of counsel claim is

thus the same under both the United States and New Jersey Constitutions. <u>State v. O'Neil</u>, 219 N.J. 598, 610 (2014).

That standard has two prongs. "First, the defendant must show that counsel's performance was deficient." <u>Strickland</u>, 466 U.S. at 687. Second, the defendant must have been prejudiced by counsel's deficient performance. <u>Ibid.</u> The defendant's conviction must be reversed if both prongs of the <u>Strickland</u> standard have been satisfied because, in such cases, "the ineffective representation constitutes 'a breakdown in the adversary process that renders the result unreliable.'" <u>State v. Nash</u>, 212 N.J. 518, 542 (2013) (quoting <u>Strickland</u>, 466 U.S. at 687).

Only the "second, and far more difficult, prong of the" <u>Strickland</u> standard -- prejudice -- is at issue here. <u>See</u> <u>Preciose</u>, 129 N.J. at 463. Under the prejudice prong, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." <u>Strickland</u>, 466 U.S. at 694; <u>accord</u> <u>State v. Loftin</u>, 191 N.J. 172, 198 (2007); <u>State v. Castagna</u>, 187 N.J. 293, 315 (2006) ("The error committed must be so serious as to undermine the court's confidence in the jury's verdict or the result reached."). That "is an exacting standard." <u>State v. Allegro</u>, 193 N.J. 352, 367 (2008). Prejudice is not to be presumed. <u>Fritz</u>, 105 N.J. at 52;

15

accord State v. Goodwin, 173 N.J. 583, 597 (2002). The defendant must "affirmatively prove prejudice." Strickland, 466 U.S. at 693; Pierre, 223 N.J. at 583.

The PCR court found, here, that trial counsel's deficiencies were not prejudicial. The Appellate Division reversed the PCR court, finding that they were. In reviewing the judgment of the Appellate Division, we will defer to the PCR court's factual findings, given its opportunity to hear live witness testimony, and "we will uphold the PCR court's findings that are supported by sufficient credible evidence in the record." Nash, 212 N.J. at 540. That deferential standard will bear upon the question presented here -- whether trial counsel's failure to call Gideon-Nichols and/or Bey as alibi witnesses at trial established prejudice under the second prong of Strickland.

### B.

In determining whether, "but for counsel's unprofessional errors, the result of the proceeding would have been different," Strickland, 466 U.S. at 694, two decisions of this Court -- Allegro and Pierre, the latter substantially relied upon by the Appellate Division -- are particularly instructive and worthy of review.

### 1.

In Allegro, after the discovery of a marijuana-growing operation in the apartment where the defendant used to live, a jury convicted the defendant of

16

maintaining or operating a controlled dangerous substance production facility and possession of a controlled dangerous substance with the intent to distribute. Allegro, 193 N.J. at 357-60. At trial, the defendant presented the testimony of both his brother and his ex-girlfriend to support his contention that he had moved out of the apartment months prior to discovery of the marijuana-growing operation. Id. at 360.

Following his conviction, the defendant filed a PCR petition alleging ineffective assistance of counsel for, among other reasons, trial counsel's failure to present four additional witnesses who would have testified that he moved out of the apartment prior to the discovery. Id. at 361. On reconsideration, the PCR court vacated the defendant's convictions and ordered a new trial, concluding that the defendant should have had the opportunity to present the witnesses. Id. at 362-63. The Appellate Division reversed and reinstated the defendant's convictions, finding that the additional witnesses' testimony would have been cumulative to the testimony of the defendant's brother and ex-girlfriend. Id. at 363-64.

We affirmed in relevant part. Id. at 373. With respect to the prejudice prong of Strickland, we stated that,

> in determining whether those additional witnesses are sufficient to prove to a reasonable probability that, absent counsel's failure to call those witnesses, the outcome of defendant's trial would have been different, we are guided, in part, by the standard applicable to claims of newly

17

discovered evidence, that is, "that the evidence 'would probably change the jury's verdict if a new trial were granted.'" In that respect, we cannot conclude to a reasonable probability that the presentation of those witnesses would have affected the outcome of defendant's case.

[Id. at 370 (quoting State v. Ways, 180 N.J. 171, 187 (2004)).]

We reached that conclusion, in part, based on the content of the proposed testimony, which challenged where the defendant lived. The State's case in Allegro, however, did not rest on whether the defendant continued to live in the apartment, but whether he grew marijuana there. Id. at 369-70. As such, the offered witnesses would not have "directly or tangentially address[ed] the State's proofs" that the defendant was solely responsible for the growing operation. Id. at 370.

Significantly, we also found that the additional witnesses would have contradicted the trial witnesses and therefore could have been harmful to the defendant. Ibid. For example, the State's witnesses testified that they frequently saw defendant's white truck near the apartment, while the defendant's brother and ex-girlfriend testified that the defendant drove a blue truck during the time leading up to the discovery of the growing operation. Ibid. The additional witnesses the defendant claimed should have been called to testify at trial would have stated that the defendant drove a white truck at the time, which would have potentially

18

undermined the defendant's existing witnesses and corroborated the State's evidence. Ibid. Thus, the "defendant's belatedly tendered witnesses well could have been harmful to him at trial." Ibid.

2.

Most relevant here is our decision in Pierre, cited throughout the Appellate Division's opinion. In Pierre, a jury convicted the defendant of felony murder, knowing and purposeful murder, aggravated assault, armed robbery, and weapons offenses stemming from an early-morning shooting in New Jersey that left one person dead and another seriously wounded. 223 N.J. at 567, 570.

The defendant asserted an alibi defense: he alleged that he was traveling to Florida to visit family at the time of the shooting. Id. at 569. In support of that alibi, the defense offered both a speeding ticket issued in South Carolina several hours before the shooting and a phone bill and related testimony from the defendant's girlfriend showing that she had received a call from South Carolina not long before the shooting. Ibid. The defendant alleged that he placed that call en route to Florida. Ibid.

The State advanced the theory that it was not the defendant, but his brother, who drove to South Carolina, received the speeding ticket, and called the defendant's girlfriend. Id. at 569-70. In support of that theory, the State attempted first to tie the defendant to the scene of the crime; however, just one of seven trial

19

witnesses identified the defendant as having been at the scene, and that identification did not come until ten months after the crime. Id. at 568. The same identifying witness also testified that she would have been unable to recognize the defendant at trial, while a separate eyewitness expressly testified that she did not see the defendant at the scene of the shooting. Id. at 584. The only other witness to place the defendant in New Jersey around the time of the crime was an admitted abuser of cocaine who knew the defendant and told police six months after the shooting that the defendant and another man came to her apartment building hours after the murder and then again days later. Id. at 584-85.

To refute the defendant's assertion that he was traveling to Florida at the time of the shooting, the State presented the South Carolina officer who issued the speeding ticket; the officer, however, was unable to recall details from when he issued the ticket or identify the defendant or his brother. Id. at 585. And the State presented no evidence that the defendant's brother took the defendant's car or license, was absent from his home or work, was seen by anyone in South Carolina, or ever visited Florida. Id. at 586.

To counter that sparse evidence, defense counsel had the opportunity to call as witnesses the defendant's brother and sister who asserted that, had they been called, they would have testified that the defendant's brother did not know how to drive; counsel did not call either potential witness. Id. at 565, 569. Moreover,

20

counsel did not enter into evidence at trial the remainder of the defendant's girlfriend's phone bill, which would have shown additional calls that she received from Florida. Id. at 569, 574. While not determinative, the record of those calls would have bolstered the defendant's claim that he was bound for Florida at the time of the shooting. Id. at 587.

Defense counsel also had the opportunity to introduce testimony from the defendant's Florida relatives that the defendant had visited them in Florida around the date of the shooting. Id. at 570-71. Affidavits from four Florida family members -- each certifying to the defendant's visit -- were presented as part of the defendant's PCR petition. Ibid. In preparing for trial, defense counsel spoke to only one of those four family members, yet dismissed the possibility of calling any of them as witnesses -- even though their account, if accepted, would have helped rebut the State's theory. Id. at 582.

The PCR court ultimately denied the defendant's petition, finding that trial counsel's strategic decision not to call additional witnesses did not prejudice the defendant's case. Id. at 574-75. In reaching that conclusion, the PCR court pointed to inconsistencies between the Florida family members' affidavits and statements the defendant made to police about the date on which he first contacted his family in Florida and whether he stayed at a hotel. Id. at 571. The PCR court also noted credibility issues with respect to the defendant's brother and sister. Id.

at 573-74. The defendant's brother admitted to a drug conviction that he initially denied. Id. at 573. And while the defendant's sister corroborated the brother's account, stating that she had never seen him drive in eleven years and that he remained home during the week following the shooting, she admitted that -- despite working for trial counsel -- she did not share that information prior to trial. Id. at 574. The Appellate Division affirmed the denial of the petition. Id. at 575.

We reversed. Id. at 588. We found counsel's performance deficient in light of his failure to present the testimony of the defendant's brother or sister and his failure "to pursue or present" potential testimony by the Florida relatives -- failures that left unrebutted the State's unsupported contention that the defendant's brother received the speeding ticket in South Carolina. Id. at 580-83.

Importantly, as to the second prong of Strickland, we noted that the State's proofs against the defendant were limited to the testimony of a single eyewitness who implicated the defendant ten months after the shooting and of the defendant's acquaintance who admitted to frequent cocaine use and who told police six months after the shooting that the defendant and another man came to her apartment building hours after the murder and then again days later. Id. at 584-85. "In that context," we concluded, the "defendant's alibi was far more significant than it would have been in the face of compelling evidence of his guilt." Id. at 585. And, again in that context, we found counsel's failure to pursue the defendant's alibi

22

defense prejudicial: notwithstanding the credibility issues of the witnesses and the misstatements of facts in the affidavits from the defendant's Florida family members, who "would have been subject to substantial impeachment had they testified," there existed a reasonable probability that, but for counsel's deficiencies, the result of the defendant's trial would have been different. Id. at 586-88.

We now apply the principles enunciated in Allegro and Pierre to the present appeal.

## IV.

We begin by considering the strength of the State's evidence. Pierre made clear that the overall strength of the evidence before the factfinder is important in analyzing the second prong of Strickland. Pierre, 223 N.J. at 583. Our observation that a "verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support," ibid. (quoting Strickland, 466 U.S. at 696), did not alter any evidentiary burdens on the part of defendants or the State. Rather, that straightforward principle acknowledges the simple reality that a conviction is more readily attributable to deficiencies in defense counsel's performance when the State has a relatively weak case than when the State has presented overwhelming evidence of guilt. Determination of prejudice requires consideration of all the evidence presented at

23

trial and the likely effect the evidence presented post-conviction would have had on the final result.

The State's proofs in <u>Pierre</u> were confined to the testimony of two witnesses with their own credibility issues; only one of those witnesses purported to place defendant at the scene of the crime. <u>Id.</u> at 568, 584. The defendant in <u>Pierre</u> supported his timely alibi with physical evidence in the form of a speeding ticket and phone bill. <u>Id.</u> at 569. The defendant offered additional physical evidence post-conviction that he called his girlfriend from Florida, <u>id.</u> at 581-82, as well as testimony by his Florida family members that would have reinforced his alibi defense. <u>Id.</u> at 587-88.

Here, in contrast, there was more evidence against Gideon. The State presented Gideon's statement to police, in which he implicated himself at least as having been present during the shooting. And Robinson, who testified for the State, corroborated Gideon's own story -- that Gideon and two men were waiting in the alley, wearing all black, and armed with a long gun. As the Appellate Division noted, the State did not present any objective physical evidence against Gideon, such as GPS data or surveillance footage, that might have placed him at the scene of the crime. Nevertheless, the State's case at trial here was stronger than the testimony of the two witnesses in <u>Pierre</u>.

And, against those stronger proofs, Gideon has offered a markedly weaker alibi defense. Unlike the defendant in Pierre, Gideon did not provide at trial, nor does he provide now, any physical evidence supporting his alibi. In Pierre, that physical evidence -- the speeding ticket and phone record -- corroborated the accounts of the witnesses defendant proposed to call. In this case, Gideon-Nichols and Bey would not have served merely to bolster Gideon's independently supported alibi or rebut the State's challenge thereto. Rather, the proposed testimony of Gideon-Nichols and Bey constitutes Gideon's alibi.

Because Gideon's alibi rests exclusively on the potential testimony of Gideon-Nichols and Bey, it is particularly significant that their testimony would have contradicted important aspects of Gideon's trial testimony, including who he was with at the time of the shooting. Had both of Gideon's proposed witnesses testified, the jury would have heard three competing accounts of Gideon's whereabouts on the night of the shooting: (1) his statement to police, (2) his trial testimony, (3) and the testimony of Gideon-Nichols and Bey, which would have overlapped in important respects and directly contradicted both of Gideon's accounts. We repeat, Gideon testified that Gideon-Nichols went to work after bringing him home, while both Gideon-Nichols and Bey testified that she stayed through the night. That discrepancy undermines a material element of the claimed alibi -- who was with Gideon at the time of the shooting.

25

Contradictions in a witness's proposed testimony are significant whether or not there is accord as to the "fundamental point" of the defendant's whereabouts at the time of the crime. See Allegro, 193 N.J. at 370 (reasoning that the proposed alibi testimony about the defendant's white truck would have clashed with other defense witness testimony that his truck was blue and thus undermined the defense).[1] If presented at trial, such contradictory testimony could have permitted the inference that if Gideon, Gideon-Nichols, and/or Bey were "false about one fact," they might have been "false about all." See State v. Fleckenstein, 60 N.J. Super. 399, 408 (App. Div. 1960) ("The maxim 'falsus in uno falsus in omnibus,' is not a mandatory rule of evidence, but rather a presumable inference that a jury . . . may or may not draw when convinced that an attempt has been made to mislead them by a witness in some material respect." (quoting State v. Guida, 118 N.J.L. 289, 297 (Sup. Ct. 1937), aff'd, 119 N.J.L. 464 (E. & A. 1938)); see also

---

[1] The Appellate Division stated that "a reviewing court applying second-prong analysis should pay closer attention to the gravamen of the additional alibi testimony -- its fundamental points -- than to details that do not directly or tangentially address the critical question as to defendant's whereabouts." The phrase "directly or tangentially" comes from Allegro, but we did not use it to suggest that inconsistencies and contradictions can be overlooked so long as they do not pertain to the critical issues in a given case. Rather, as noted above, we used that phrase to highlight the limited potential utility of the proposed alibi testimony -- even absent the contradictions we went on to discuss -- given that it would not have diminished the State's case because it spoke to an extraneous point and did not "directly or tangentially address the State's proofs." Allegro, 193 N.J. at 370.

Capell v. Capell, 358 N.J. Super. 107, 111 n.1 (App. Div. 2003) (explaining the maxim). Accordingly, whether falsehoods are material or ancillary, they may be considered by the PCR court as affecting a witness's credibility.

Here, the PCR court found, and we agree, that the testimony of either Gideon-Nichols or Bey "would not only have served as an attack on the testimony of [Gideon] which had already been presented to the jury, but if anything would have increased the likelihood of conviction based upon th[e] discrepancies." In addition to those discrepancies, the PCR court noted factors that undermined Gideon-Nichols's credibility, such as her bias and criminal record. Indeed, the PCR court found as a fact that Gideon-Nichols never approached defense counsel to offer alibi testimony. We acknowledge, as did the Appellate Division, that the PCR court did not list similar credibility concerns with respect to Bey. But we cannot agree with the Appellate Division's view that presenting the testimony of Bey alone would, with reasonable probability, have resulted in a different outcome in this case.

Merely presenting Bey and not Gideon-Nichols would have necessarily included in Bey's testimony that she accompanied Gideon-Nichols to the scene of the fight and that they both remained home with Gideon through the night. That testimony would have been inconsistent with Gideon's trial testimony that Gideon-Nichols intercepted him while he was on his way home and that Gideon-Nichols

27

thereafter went to work. And that inconsistency, in turn, would have permitted the false-as-to-all inference, just as if both Gideon-Nichols and Bey had testified.

We also find significant the passage of time between the shooting in 2004, Gideon's trial in 2007, and Bey's support for Gideon's alibi appearing in 2012 or 2013.[2] Unlike in Pierre, where the defendant served a notice of alibi on the State, 223 N.J. at 580, no mention of Gideon's alibi was made until his cross-examination at trial. And Bey was present in the courtroom during Gideon's trial yet made no effort to buttress his alibi at that time.

Bey's failure to come forward in support of Gideon's alibi until roughly five years after his trial -- and approximately eight years after the shooting -- creates a separate issue with respect to her credibility. As we have previously acknowledged,

> where the natural response of a person in possession of exculpatory information would be to come forward in order to avoid a mistaken prosecution of a relative or a friend[,] . . . the failure of a witness to offer the information when it would have been natural to do so might well cast doubt on the veracity of the witness' trial testimony.
>
> [State v. Silva, 131 N.J. 438, 446 (1993) (quoting Commonwealth v. Brown, 416 N.E.2d 218, 224 (Mass. App. Ct. 1981)).]

---

[2] Bey's certification was not dated, but Gideon-Nichols's certification was dated December 29, 2012 and Gideon's PCR petition was dated April 27, 2012 and was thereafter supplemented through 2013.

28

Thus, "defendant's belatedly tendered witness[] well could have been harmful to him at trial." Allegro, 193 N.J. at 370.

The Appellate Division interpreted Pierre to suggest that the failure to offer alibi testimony can be deemed prejudicial -- regardless of adverse credibility determinations -- if the testimony would have bolstered the defendant's alibi "on the fundamental point" of the defendant's whereabouts at the time of the crime. Such reasoning would require a new trial whenever a third party -- no matter how incredible -- asserts that a defendant was elsewhere at the time of a crime. Pierre, in which the defendant's alibi was supported by physical evidence beyond the proposed testimony, did not set such a standard. We have never so weakened the standard for demonstrating prejudice, and we do not do so here.

The prejudice prong of Strickland remains an "exacting standard." Allegro, 193 N.J. at 367. We repeat that "[i]mportant to the prejudice analysis is the strength of the evidence that was before the fact-finder at trial." Pierre, 223 N.J. at 583. Against the backdrop of that evidence, the Strickland test, which we continue to apply, requires a defendant to show there exists "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." State v. Taccetta, 200 N.J. 183, 193 (2009) (quoting Fritz, 105 N.J. at 52); see also State v. Hess, 207 N.J. 123, 146 (2011); Goodwin, 173 N.J. at 597.

In this case, the onus remained on Gideon to "affirmatively prove prejudice." Pierre, 223 N.J. at 583 (quoting Strickland, 466 U.S. at 693); see also Fritz, 105 N.J. at 52 ("[P]rejudice must be proved; it is not presumed."). But he has not shown that Bey's proposed testimony, whether alone or in combination with that of Gideon-Nichols, "would probably change the jury's verdict if a new trial were granted." Allegro, 193 N.J. at 370 (quoting Ways, 180 N.J. at 187). Considering the strength of the State's case and the weakness of Gideon's alibi -- including the extent to which his proposed witnesses would have contradicted his own account of the relevant events -- the PCR court's finding that Gideon failed to demonstrate prejudice should not have been disturbed.

In reaching that conclusion, we defer to the PCR court's credibility determinations, which, as noted above, find sufficient credible support in the record. See Nash, 212 N.J. at 540. "An appellate court's reading of a cold record is a pale substitute for a trial judge's assessment of the credibility of a witness he has observed firsthand." Ibid. Here, we see "no basis to second-guess the credibility findings of the PCR court." Id. at 545. Although the Appellate Division may have "reached a different conclusion were it the trial tribunal," it was not at liberty to disturb the PCR court's findings absent a clear mistake, which we do not find here. State v. Elders, 192 N.J. 224, 244 (2007) (quoting State v. Johnson, 42 N.J. 146, 162 (1964)).

30

V.

The judgment of the Appellate Division is reversed. The PCR court's order denying Gideon's petition is reinstated.


CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA, ALBIN, PATTERSON, FERNANDEZ-VINA, and PIERRE-LOUIS join in JUSTICE SOLOMON'S opinion.