**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0608-19

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

JONATHAN P. THOMAS,

     Defendant-Appellant.

_____

Submitted January 19, 2021 – Decided February 22, 2021

Before Judges Fasciale and Rothstadt.

On appeal from the Superior Court of New Jersey, Law Division, Salem County, Indictment No. 12-01-0001.

Joseph E. Krakora, Public Defender, attorney for appellant (Anthony J. Vecchio, Designated Counsel, on the brief).

John T. Lenahan, Salem County Prosecutor, attorney for respondent (David M. Galemba, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Defendant Jonathan P. Thomas appeals from the Law Division's order filed on April 16, 2019, denying his petition for post-conviction relief (PCR) without an evidentiary hearing for the reasons stated in the PCR judge's seventeen-page written decision. Defendant contends that the PCR judge should have held an evidentiary hearing because defendant established a prima facie claim of ineffective assistance of counsel (IAC) based upon trial counsel's failure to investigate two alibi witnesses and one third-party guilt witness, and failed to call those witnesses at trial. For the reasons that follow, we affirm.

I.

A.

We detailed the facts underlying defendant's conviction for murder and related charges in our earlier unpublished opinion affirming the convictions of defendant and his co-defendants, Antwione A. Parsley[1] and Ahmar Butler. State v. Butler, No. A-0381-13 (App. Div. March 30, 2017) (slip op. 5-17). In order to give context to defendant's claims on PCR and the PCR judge's decision, we describe some of those details here as they relate to witnesses who testified against defendant at trial.

---

[1] Although the record indicates the spelling of his name is as indicted, we have been informed that the actual spelling is Antoine A. Parsley.

On the evening of September 7, 2008, Joseph Hayes, known as "P-Hood," was fatally shot at his home in Salem City. During the investigation, police recovered Hayes's cell phone, which showed Hayes received a phone call shortly before his death. Police were able to track that call to Maurice Brown,[2] who was considered a person of interest, but after he was interviewed several times he was never arrested.

At trial, the State's theory was that Hayes was murdered because defendant and Parsley learned that Hayes cooperated with the State on another matter involving defendant and Parsley. The State presented five witnesses linking defendant and his co-defendants to the shooting of Hayes. The first, Thomas Minter, gave a recorded statement to the police the day after the shooting occurred.[3] In the transcript of Minter's recorded statement, he told police that at around ten-thirty or eleven o'clock, he observed defendant and Parsley walk towards an alley in the area of Hayes's home and minutes later, heard gunshots. Minter also ran into defendant and Parsley the following day, about an hour

---

[2] There are three individuals with the surname Brown. Maurice Brown and Mark Brown are brothers. One witness is named Shameek Brown. We refer to each of them by their first names in subsequent references to avoid any confusion caused by their common last name.

[3] At trial, Minter recanted, and a redacted version of his taped statement was played for the jury. The trial transcript reflects only that the statement was played and does not reflect what portions of the statement were played.

A-0608-19

before he met with the police, and heard the two men talking about the shooting. He heard them say that Hayes's name was mentioned in someone's discovery packet. At trial, Minter recanted and testified to his criminal history, but denied seeking favorable treatment in exchange for his testimony.

The State also presented Daryl Massengill. Massengill acknowledged that he gave a statement to the police on May 23, 2011. At trial, he too recanted and claimed his previous statement was incorrect and that he had lied. His statement was also played for the jury.[4] In his statement, Massengill told the police that he overheard Butler in prison admitting to killing Hayes. Massengill also confirmed his criminal history, but he did seek favorable treatment in exchange for his testimony.

Malcolm Moore also testified at trial. Moore testified that seconds after he heard gunshots, he saw Butler and defendant running from Carpenter Street, wearing all black and carrying guns. He then watched the two men get into the car with Parsley and drive off. Moore then heard screaming and walked over to where he could see Hayes's body lying half outside the home. For months after the shooting, Moore played video games with Parsley weekly, specifically "Call of Duty." One day, when Moore asked Parsley why he always chose the same

---

[4] Here again the trial transcript does not reflect which parts of the statement were played for the jury.

type of gun when playing the game, Parsley told him "that's the gun I used to kill P-[H]ood with." Parsley also told Moore that he disposed of the guns by throwing them off a bridge.

Approximately a year-and-a-half after the shooting, Moore spoke to the police and entered into a cooperation agreement. He testified that he spoke to the police because he "fe[lt] as though it was wrong for what happened to P-Hood" and that Hayes was a good friend, but Moore also acknowledged that he "provided information because [he] was in a tight jam," and was "lookin[g] at some serious time, about [twenty] years." Therefore, he felt like he had information to trade.

The State also presented testimony from Leslie Bundy. Bundy also acknowledged his criminal history but stated that he was not personally benefitting from his testimony at the time of the trial. He testified that on the night of the shooting, he was walking in Salem and saw defendant with another man, whom he could not identify because it was dark and he could not see the man's face, walking towards an open lot behind Hayes's house. After seeing them, Bundy kept walking towards his sister's house and heard gunshots when he arrived; but he ran back to Hayes's house because he got a call that Hayes had been shot. He observed Hayes "laying in between his doorway, in his backdoor." Bundy remained there for about twenty to twenty-five minutes, but

A-0608-19

5

after police arrived, he left and while walking, he saw Parsley speaking with defendant and another man, but he never saw the third man's face.

Approximately a week-and-a-half after the shooting, Bundy and Parsley were both detained in the Salem County Correctional Facility for matters unrelated to the shooting. Bundy testified that while there, he overheard two conversations Parsley had in which Parsley claimed he took "care of" Hayes. Bundy also testified that in 2009, he gave an informal statement to the police, and in June 2011, he returned and gave a formal statement to the police. On cross-examination, he acknowledged that he entered into a cooperation agreement with the State in 2003, but that agreement was no longer in effect when he spoke with the police in 2009. He also acknowledged that he is blind in his left eye and had that condition on the night of the shooting as well.

The State also presented the testimony of Shameek Brown. Shameek also testified to his criminal history and that he entered into a cooperation agreement with Salem County Prosecutor's Office in exchange for his testimony in this case. According to Shameek, on February 27, 2013, he was incarcerated in the Salem County Correctional Facility along with Butler and defendant. That morning, he heard defendant "telling Butler how a man named P would still be here if he wasn't snitching or trying to take the stand." He heard Butler reply, "these rat-ass niggas" and defendant replied, "you know me, I shoot first, ask

questions later. I had to get that rat-ass nigga out of here." Defendant was standing outside of Butler's cell at the time of this conversation and Butler was inside the cell. After hearing the conversation, Shameek contacted his attorney and on March 5, 2013, he gave a statement to police; two days later he signed a cooperation agreement with the State and entered guilty pleas on the charges against him. On March 9, 2013, he was released from jail two days after pleading guilty.

To corroborate Shameek's testimony regarding the conversation between defendant and Butler, the State presented Corrections Officer David DeMarco to narrate a surveillance video from the morning of February 27, 2013. The video showed defendant standing outside of cells eight and nine on the first tier, Butler inside cell eight, and Shameek walking down the stairs from his cell on the second tier. DeMarco never heard the conversation between defendant and Butler but remembered telling them to stop talking a few times. He also testified that Shameek never mentioned overhearing a conversation about murder.

Defendant and his co-defendants invoked their rights and did not testify at trial. Defendant presented Corey Simmons as a witness, who was in jail with defendant at the end of February 2013 and testified that he never heard defendant mention any crime. On cross-examination, Simmons said that he never overheard conversations between defendant and other inmates and that he was

A-0608-19

7

in cell twenty-four, while defendant was in cell four. Defendant also presented Kendall Rollines, another individual in jail with him in February 2013, who said that while in jail with defendant he never heard defendant mention his case or any other crime. Rollines acknowledged on cross-examination that he was not housed in the same pod as defendant.

Defendant and Butler were found guilty of murder, N.J.SA. 2C:11-3(a)(1), (2); aggravated assault, N.J.S.A. 2C:12-1(b)(1), (2); possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a); and conspiracy to commit murder and aggravated assault, N.J.S.A. 2C:5-2. Parsley was convicted of conspiracy to commit murder, N.J.S.A. 2C:5-2, N.J.S.A 2C:11-3(a)(1); and conspiracy to commit aggravated assault N.J.S.A. 2C:5-2, N.J.S.A 2C:12-1(b)(1). Each defendant was sentenced to a fifty-year prison term, with an eighty-five percent period of parole ineligibility pursuant to the No Early Release Act (NERA), N.J.S.A 2C:43-7.2.

On direct appeal, we rejected several arguments presented by defendant and his co-defendants, and we affirmed their convictions and sentences. Butler, slip op. at 17-33. The Supreme Court denied certification. 233 N.J. 17, 128, 129 (2017).

B.

Defendant filed a pro se petition for PCR on September 13, 2017, claiming IAC based on trial counsel's alleged failure to call alibi witnesses on defendant's behalf, counsel "stipulating to photos of the victim in which one of the photos depicted victim's testicles[,]" and counsel's failure to exercise "due diligence in doing a full investigation into witness background." Defendant also alleged that the State failed to disclose material "that would've helped defense build a more solid defense" in violation of Brady.[5] In a brief filed on defendant's behalf, he argued IAC on the grounds that counsel failed to adequately investigate potential witnesses, make proper objections at trial, and adequately prepare for trial.

Defendant submitted a supporting certification, dated July 16, 2018, in which he stated that in April 2012, he spoke with his trial counsel at a court hearing about his alibi witnesses, Dexter Cannady and Krishaan Johnson, and gave him a letter that included the witnesses' names and addresses. He also stated that in July 16, 2012, he wrote trial counsel asking if counsel sent a private investigator to speak with the witnesses. Finally, he certified that in August 2012, he spoke to counsel at a court hearing about his alibi witnesses and

---

[5] Brady v. Maryland, 373 U.S. 83 (1963).

whether defendant would testify at trial. His counsel told him that he had "everything under control" and that he would keep defendant posted.

In further support of PCR, defendant also submitted a sworn statement from Cannady, which was not dated, but marked "12/19." Cannady stated that on September 7, 2008, he had a "get together" to celebrate the release of his album from 8 p.m. to 2 a.m. The party was at a friend's home in Salem. On the night of the party, he was "in the company of a small group of friends including [defendant]." While performing at the party, he observed defendant celebrating, dancing, and socializing. According to Cannady they were "all celebrating all night having a good time." He stated that he was willing to testify about defendant's whereabouts on September 7, 2008.

In addition, defendant submitted a September 28, 2017 affidavit from Johnson, who stated that he was "with [defendant] Sunday September 7, 2008 on the night of the Joseph Hayes homicide." He stated he was with defendant "the whole day upon attending Dexter Cannady's album release party together." He claimed that defendant could not have committed the murder because Johnson was in his presence the whole day.

Finally, defendant submitted an affidavit from Charlene Daniels, dated March 5, 2018, in which Daniels stated that on the night of the shooting, she was standing outside her home, across the street from Hayes's house, and heard

A-0608-19

several gunshots. After she heard the shots, she saw Mark Brown and Maurice Brown, who had a gun in his hand, running from the back of Hayes's home.

The PCR judge considered the parties' oral arguments on March 18, 2019, and on April 11, 2019, he issued his comprehensive statement of reasons that was followed by the filing of the order denying relief. The PCR judge found that trial counsel was not deficient in failing to call the alibi witnesses. He found that "it was the clear trial strategy of all three co-defendants in this case to paint the State's witnesses as unreliable because of their criminal backgrounds and motivations to testify untruthfully against [defendant]." He highlighted that during trial, defendant's counsel elicited Massengill's deal with the State for his pending criminal charges, cross-examined Bundy on his prior convictions, and in his closing argument "went through the State's 'men with baggage,' and highlighted each of their criminal backgrounds."

Additionally, the PCR judge explained that Cannady and Johnson had prior convictions and offering their testimony "would only have served to undermine the defense that trial counsel put forward." As the judge concluded, offering defendant's proffered alibi witnesses would have "shifted the jury's focus from the criminal backgrounds of the State's witnesses, to the criminal backgrounds of [defendant's] witnesses, and therefore undermined trial

counsel's strategy." Thus, counsel's failure to call the witnesses was not deficient but instead a strategic decision.

The PCR judge continued that even if the witnesses were called at trial, the alibi evidence was weak and easily rebuttable. As to Cannady's statement, he claimed he saw defendant at a party the night of the murder but did not provide what time he saw defendant. Thus, "[t]aken at face value, his testimony would leave open a strong possibility that [defendant] could have gone to the party after the murder occurred." As to Johnson's certification, the judge noted that Johnson did not provide any specific details about the party, such as the time defendant arrived at the party, the location of the party, "or any other supporting facts." Due to this lack of specificity, the judge determined that "at face value, the testimony is not specific enough to constitute a strong alibi defense," and "is easily rebuttable by the State." He therefore concluded defendant was not prejudiced by counsel's decision at trial and held that defendant was not entitled to an evidentiary hearing.

As to defendant's claim that trial counsel failed to call Daniels as a third-party guilt witness, the judge concluded it did not rise to IAC because her post-trial affidavit differed from her statement given to police two days after the murder. He explained that trial counsel had no reason to believe that Daniels established any third-party's guilt from her police statement. He observed that

her two statements were clearly different, and counsel had no way of knowing Daniels' post-trial statement pre-trial. Finally, he concluded that defendant was not prejudiced by the failure to call Daniels because she would have been easily impeached with her inconsistent statement to police, had she given her 2017 account at trial in 2013.

The PCR judge also addressed and rejected the balance of defendant's claims on PCR. This appeal followed.

II.

On appeal, defendant makes the following argument:

> THE PCR [JUDGE] ERRED IN NOT GRANTING DEFENDANT AN EVIDENTIARY HEARING WHERE DEFENDANT RECEIVED [IAC] BECAUSE OF TRIAL COUNSEL'S FAILURE TO CONDUCT AN ADEQUATE PRE-TRIAL INVESTIGATION AND FAILURE TO CALL ALIBI WITNESSES TO TESTIFY ON DEFENDANT'S BEHALF.

Specifically, defendant contends that an evidentiary hearing was required to understand why trial counsel did not call the alibi witnesses and the third-party guilt witness at trial. He also highlights that the State's case was primarily reliant upon testimonial evidence, and no physical evidence linked him to the crime, making trial counsel's omission prejudicial.

In response, the State argues that defendant failed to support his claim that trial counsel did not interview the witnesses prior to trial, that trial counsel's failure to call the alibi witnesses was part of a reasonable strategy, that the affidavits do not support an alibi defense, and that defendant was not prejudiced by not presenting these alibi witnesses at trial.

A.

When a PCR judge does not hold an evidentiary hearing, our standard of review is de novo as to both the factual inferences drawn by the PCR judge from the record and the judge's legal conclusions. State v. Blake, 444 N.J. Super. 285, 294 (App. Div. 2016).

Both "[t]he Sixth Amendment of the United States Constitution and Article I, paragraph 10 of the New Jersey Constitution require that a defendant receive 'the effective assistance of counsel' during a criminal proceeding." State v. Porter, 216 N.J. 343, 352 (2013) (citing Strickland v. Washington, 466 U.S. 668, 685-86 (1984) and State v. Fritz, 105 N.J. 42, 58 (1987)). These guarantees are "premised on the need 'to protect the fundamental right to a fair trial.'" State v. Pierre, 223 N.J. 560, 577 (2015) (quoting Strickland, 466 U.S. at 684). Given this mandate of a fair trial, "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having

produced a just result." Ibid. (alteration in original) (quoting Strickland, 466 U.S. at 686).

"A PCR petition is cognizable if it is based upon a '[s]ubstantial denial in the conviction proceedings of defendant's rights under the Constitution of the United States or the Constitution or laws of the State of New Jersey.'" State v. Gideon, ___ N.J. ____, ____ (2021) (slip op. at 13) (alteration in original) (quoting R. 3:22-2(a)). Rule 3:22–10(b) provides, in pertinent part, that

> [a] defendant shall be entitled to an evidentiary hearing only upon the establishment of a prima facie case in support of [PCR], a determination by the court that there are material issues of disputed fact that cannot be resolved by reference to the existing record, and a determination that an evidentiary hearing is necessary to resolve the claims for relief.

Under our framework, in order to show an evidentiary hearing is warranted, a defendant must make a prima facie showing that: (1) counsel's performance was deficient; and (2) the deficiency prejudiced the defendant. Strickland, 466 U.S. at 687; Fritz, 105 N.J. at 58.

When making this determination, we "view the facts in the light most favorable to a defendant to determine whether a defendant has established a prima facie claim." State v. Preciose, 129 N.J. 451, 462-63 (1992). But importantly, a defendant must "do more than make bald assertions that he was denied the effective assistance of counsel" to establish a prima facie claim

15

entitling him to an evidentiary hearing. State v. Cummings, 321 N.J. Super. 154, 170 (App. Div. 1999).

Defendants asserting IAC must meet a high burden because "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." Strickland, 466 U.S. at 690. This principle is especially true, where, as here, a defendant asserts that his counsel was ineffective for failing to call witnesses at trial. Our Supreme Court has explained that "[d]etermining which witnesses to call to the stand is one of the most difficult strategic decisions any trial attorney must confront." State v. Arthur, 184 N.J. 307, 320 (2005). Indeed, determining which witnesses to call is an "art" and a court's review of that decision should be "highly deferential." Id. at 321 (quoting Strickland, 466 U.S. at 693). This deference extends to decisions about whether to present an alibi defense. State v. Drisco, 355 N.J. Super. 283, 291 (App. Div. 2002) ("Counsel's fear that a weak alibi could cause more harm than good is the type of strategic decision that should not be second guessed on appeal.").

Nevertheless, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." State v. Chew, 179 N.J. 186, 217 (2004) (quoting Strickland, 466 U.S. at 691). The "decision not to investigate must be directly assessed for reasonableness in

all the circumstances, applying a heavy measure of deference to counsel's judgments."  Strickland, 466 U.S. at 691.  If trial counsel "thoroughly investigate[d] law and facts, considering all possible options, his or her trial strategy is 'virtually unchallengeable.'"  State v. Savage, 120 N.J. 594, 617 (1990) (quoting Strickland, 466 U.S. at 690-91).  "But strategy decisions made after less than complete investigation are subject to closer scrutiny."  Id. at 617-18.

When raising a failure to investigate claim, a defendant "must assert the facts that an investigation would have revealed, supported by affidavits or certifications based upon the personal knowledge of the affiant or the person making the certification."  Porter, 216 N.J. at 353 (internal quotation marks omitted) (quoting Cummings, 321 N.J. Super. at 170).  Despite the deference to counsel's strategy decisions, "[f]ailure to investigate an alibi defense is a serious deficiency that can result in the reversal of a conviction."  Ibid.

B.

With these principles in mind, we turn first to defendant's claim that counsel failed to investigate his proposed alibi witnesses.  The PCR judge did not specifically address whether trial counsel failed to investigate, instead, the judge determined it was a strategic decision not to call the witnesses.  He found that from the record, there was a "clear trial strategy" of all three defendants to

17

paint the State's witnesses as unreliable based on their motivations in testifying and their criminal convictions. Thus, because of the convictions of the proposed alibi witnesses, the PCR judge concluded that counsel's strategy would have been undermined by calling them, and therefore, he was not deficient in not calling them.

In his PCR certification, defendant did not specifically state that counsel failed to investigate or contact these witnesses. Rather, he stated that he presented their names and addresses to counsel and when he asked for an update, counsel told him he had "everything under control." Moreover, in their statements filed on PCR, neither Cannady nor Johnson assert that trial counsel never met with them or attempted to contact them regarding this case. Consequently, there is no indication in the record that trial counsel did not investigate these witnesses or that it was not a strategic decision he made after said investigation.

Under these circumstances, we conclude that defendant failed to establish a prima facie claim of IAC on his claim that counsel failed to investigate his witnesses. Defendant has not supported his allegations with any "specific facts and evidence" as required. Porter, 216 N.J. at 355. Unlike the defendant in Porter, who submitted a certification from himself and his witness that counsel failed to contact the witness, which was sufficient to sustain a claim of IAC for

failure to investigate, see id. at 347, 349-50, defendant here failed to meet his burden. From the record, it is clear counsel did investigate the case, as he called witnesses on defendant's behalf and extensively cross-examined and attempted to impeach the State's witnesses on their prior convictions. Thus, we conclude that there was insufficient evidence of IAC based on defense counsel's alleged failure to investigate these witnesses at trial.

We also conclude that counsel was not deficient in failing to investigate Daniels at the time of trial. Years after trial, Daniels placed Maurice, who called Hayes shortly before his death, fleeing the scene of the crime with a gun in his hand. But in her statement to the police the day after the shooting, Daniels explained that she saw Mark Brown, Maurice's brother, running near the scene of the crime after the shooting. When Daniels saw Mark later that evening, she asked why he was running, and he said because he heard shots. Daniels did not mention a gun, nor did she mention Maurice as she did in her post-trial statement. Mark was not considered a person of interest to the police, and Maurice, who was considered a person of interest and was interviewed several times, was not mentioned by Daniels until after trial.

As there was no reason to believe Daniels even saw Maurice until her statement years after trial, counsel was not deficient in failing to investigate her. Moreover, based on her statement to police there was no reason for trial counsel

19

to believe she could support a third-party guilt defense. Thus, we cannot conclude that counsel's performance was deficient. See Strickland, 466 U.S. at 690 (explaining that a court "must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct").

## C.

Turning to defendant's claim that counsel's failure to call his alibi witnesses established IAC, we initially observe in our review of such claims, we "indulge a strong presumption" that counsel's conduct is reasonable absent evidence to the contrary. Id. at 689; see State v. Allegro, 193 N.J. 352, 366 (2008). To rebut that presumption, defendant must establish that his counsel's actions "did not equate to sound trial strategy." Ibid. (quoting State v. Castagna, 187 N.J. 293, 314 (2006)).

Here, defendant's evidence for PCR did not rebut the presumption that counsel was not deficient by not calling the alibi witnesses in light of counsel's approach at trial, which was aimed at discrediting the State's witnesses as "men with baggage." We agree with the PCR judge that not calling these witnesses was in line with an overall strategy to focus the jury's attention on discrediting the State's witnesses and thus do not find his performance deficient.

We also do not find that defendant has shown he was prejudiced by not calling these witnesses.  Prejudice must be affirmatively proven.  Strickland, 466 U.S. at 693.  It may not be presumed.  Fritz, 105 N.J. at 52.  A court assessing prejudice must look at the "totality of the evidence" submitted to the judge or jury.  Strickland, 466 U.S. at 695.  "[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support."  Ibid.

As guided by the New Jersey Supreme Court's recent opinion in Gideon, "[w]e begin by considering the strength of the State's evidence."  Gideon, __ N.J. __ (slip op. at 23).  In determining whether the defendant has shown prejudice, "the overall strength of the evidence before the factfinding is important."  Ibid. (citing Pierre, 223 N.J. at 583).  This is so because "a conviction is more readily attributable to deficiencies in defense counsel's performance when the State has a relatively weak case than when the State has presented overwhelming evidence of guilt."  Ibid.  In Gideon, the Court found that the defendant had not shown any prejudice when the testimony of the alibi witnesses in part contradicted the defendant's own trial testimony, and the alibi testimony "constitute[d]" the entire alibi, with no additional evidence to support it.  Id. at __ (slip op.at  25).

Here, a medical examiner determined Hayes died of gunshot wounds and the parties stipulated that Hayes was killed by bullets from two different handguns. No DNA or fingerprint evidence established the identities of the shooters. Neither defendant nor his co-defendants provided a statement to the police. The cumulative testimony of the five pertinent witnesses—Minter, Massengill, Moore, Bundy, and Shameek—placed defendant near Hayes's home just before and after the shooting, carrying a gun on the night in question, and talking about the murder with his co-defendants on multiple occasions. They also provided an explanation as to defendant's motive to kill Hayes. These witnesses presented various credibility issues, all five had prior convictions, three had pending cooperative agreements with the State, two recanted, and one had a vision impairment.

As to Minter, while he recanted at trial, the statement he gave the morning after the shooting, which was much closer in time to the event than his trial testimony, was played for the jury. Moreover, Shameek's testimony that defendant and Butler talked about the murder was partially corroborated by the surveillance video from the jail showing defendant standing outside of Butler's cell talking. It did not corroborate the contents of that conversation, however.

Against that evidence, defendant has offered a weak alibi defense. Defendant's alibi witnesses, if believed, only confirm that defendant was at a

party in Salem on the night of the shooting. Neither provided specific details as to defendant's arrival time. Cannady certified the party was from 8 p.m. to 2 a.m. and that they partied all night together. Johnson certified defendant could not have committed the murder because he was with defendant the entire day upon attending Cannady's party. There is no additional evidence to support these claims.

As the PCR judge noted, the affidavits do not precisely specify the timing of defendant's presence at the party. Indeed, it would be theoretically possible that he was involved in the shooting and then went to a party, or went to the party first and then left, as they both occurred in Salem City. Further, and more importantly, defendant's alibi is not independently supported by any other evidence, instead, the alibi witnesses' proposed testimony "constitutes" defendant's alibi. See ibid.

Despite recognizing that the State's evidence here was not as strong as it was in Gideon, where the State had a statement from defendant placing him at the scene of the crime, we conclude defendant has not made a prima facie showing of prejudice necessary to requiring the PCR judge to order an evidentiary hearing.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0608-19

23