939 A.2d 754

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v.
WILLIAM J. ALLEGRO, DEFENDANT–APPELLANT.

Argued November 13, 2007—Decided January 29, 2008.

354

*Kelly Anderson Smith* argued the cause for appellant.

*Barbara N. Suppa,* Assistant Prosecutor, argued the cause for respondent (*Luis A. Valentin,* Monmouth County Prosecutor, attorney).

Justice RIVERA–SOTO delivered the opinion of the Court.

An early morning fire in a garage apartment in the Borough of Bradley Beach led to the discovery of a marijuana growing facility on the premises. That discovery resulted in defendant William J. Allegro's convictions and sentence for maintaining or operating a controlled dangerous substance production facility and for possession of a controlled dangerous substance with intent to distribute. Defendant's convictions and sentence were affirmed on appeal and

his petition for certification was denied. 175 *N.J.* 547, 816 *A.*2d 1048 (2003). Defendant then petitioned for post-conviction relief (PCR), as provided in *Rules* 3:22–1 to –12, alleging that his trial counsel was ineffective in eighteen separate respects. The PCR court first denied defendant's petition. Defendant sought reconsideration and, focusing exclusively on an alleged failure by defendant's trial counsel to interview and produce additional witnesses at defendant's trial, the PCR court vacated defendant's convictions and ordered a new trial.

On the State's application, a divided Appellate Division panel reversed and reinstated defendant's convictions and sentence, concluding that defendant's petition for post-conviction relief failed to satisfy the two prongs of the *Strickland/Fritz* ineffective assistance of counsel standard.[1] Based on the dissent in the Appellate Division, defendant filed an appeal as of right before this Court. *N.J. Const.* art. VI, § V, ¶ 1(b); *R.* 2:2–1(a)(2). We affirm in part and reverse in part the judgment of the Appellate Division.

## I.

At 7:19 a.m. on February 21, 1999, there was a fire in a garage apartment located at 408 Monmouth Avenue in the Borough of Bradley Beach; that garage apartment was leased to defendant. Patrolman Michael Ricciardi of the Bradley Beach Police Department, having been dispatched to the scene of the fire, observed flames stretching from the garage on the ground floor to the second floor apartment. Thinking that "the fire might be suspicious[,]" he called the fire marshal and his own police lieutenant. Bradley Beach's Code Enforcement Officer and Fire Marshal, Keith DiLello, responded to Ricciardi's call. DiLello assisted the firefighters in combating the blaze and observed a concentration of fire in the first floor garage that extended to the second floor apartment. However, DiLello did not enter the second floor

---

[1] *Strickland v. Washington,* 466 *U.S.* 668, 104 *S.Ct.* 2052, 80 *L.Ed.*2d 674 (1984); *State v. Fritz,* 105 *N.J.* 42, 519 A.2d 336 (1987).

apartment until the fire was under control and he had the opportunity to start his own investigation.

When DiLello did start his investigation he was accompanied by Ricciardi, as was the practice of the Bradley Beach Police Department. Once in the second floor apartment, DiLello and Ricciardi observed fluorescent lights, irrigation pumps, high wattage light bulbs, potted plants and bags of what was later determined to be marijuana, but no furniture. Although he had been unaware of the presence of marijuana plants on the premises and he had not smelled burning marijuana, Ricciardi's initial reaction was striking:

[T]he first thing that actually came to mind was [it] looks like a rain forest in here. Fluorescent lights, pumps, irrigation, big 800[-]watt light bulbs. All different types of things, potted plants. Some of them had their stems, you know, the leaves burnt off, but additional ones had the leaves still on there.

Ricciardi had no doubt of what he saw: he immediately recognized the plants to be marijuana and the equipment to be part of an indoor growing facility. After notifying his lieutenant of what he had found, Ricciardi, with DiLello's assistance, removed the plants and lighting equipment.

In the interim, Mark Christensen, a volunteer fireman, made his own discovery. Christensen, who had been combing the apartment for a misplaced fire department axe, was searching in a pile of debris. According to his testimony, while looking through that pile, he moved a box, the box popped open, and he saw what he thought was marijuana; later tests disclosed that the box in fact contained eight pounds of marijuana. Continuing his search, Christensen found and opened a similar box nearby, and it too contained marijuana. When he called out for the police, Ricciardi responded and seized both boxes of marijuana.[2]

The proofs at trial against defendant were overwhelming. In addition to the evidence retrieved from the scene of the fire, the State presented the testimony of Muruvvet Reyal, the owner/land-

---

[2] The contents of the second box were suppressed by the trial court and, thus, played no part in defendant's conviction.

lord of 408 Monmouth Avenue; William Nutting, the renter who lived in the house at the front of the property, and DiLello. Reyal testified that, at the time of the fire, defendant was the renter of the garage apartment. She stressed that defendant was often tardy in his rent payments, and that she regularly had to knock on the door of the garage apartment and demand the rent from defendant. As far as Reyal knew, defendant lived in the garage apartment.

That view also was shared by Nutting who, as the resident of the home in front of the garage, described defendant's comings-and-goings to and from the garage apartment. Nutting explained that defendant would arrive at the garage apartment late at night and often leave almost immediately thereafter. He testified that he thought defendant was living with a girlfriend, but that he had last seen defendant at the premises the night before the fire occurred. Nutting testified to his belief that, at the time of the fire, defendant lived in the garage apartment.

DiLello's testimony covered two distinct areas. First, in his capacity as the Borough's fire marshal, DiLello testified as to the cause and origin of the fire. He explained that an electrical overload caused the electrical wiring to overheat, ultimately igniting a fire in the garage area that burned up into the second floor apartment. Second, in his capacity as the Borough's code enforcement officer, DiLello testified that in 1994 he had issued a certificate of occupancy for the garage apartment to defendant's brother, James, and that the certificate of occupancy had been amended in 1998—the year before the fire—to add defendant as a listed occupant of the premises.

The most damning testimony in the State's case, however, was a recorded telephone call from someone who identified himself as "Skip" Allegro. Detective Lieutenant Richard Lizzano of the Bradley Beach Police Department testified that, on February 24, 1999—three days after the fire—he received a telephone call from someone who specifically asked to speak with Det. Lt. Lizzano and

who identified himself using defendant's nickname, "Skip"[3] following the Bradley Beach Police Department's procedure, that telephone call was recorded in its entirety. When Det. Lt. Lizzano pressed for more identifying data from the caller, he referred to himself as "the one you are looking for." Rejecting Det. Lt. Lizzano's request that he turn himself in, the caller represented that he was "already gone[,]" that he was "already out of state[,]" and that he was "not going to call [Det. Lt. Lizzano] until after [he] was out of state." The following exchange ensued:

DET. LT. LIZZANO: Could you do this much for me?

CALLER: What?

DET. LT. LIZZANO: Could you tell me that it is only yours or does it involve Jimmy as well.[4]

CALLER: No, *it doesn't involve nobody else, nobody.*

DET. LT. LIZZANO: Well, we are looking into that. The utilities are in his name and stuff like that.

CALLER: No, no. The electric is out of his name. 'Cause he moved and it was left like that for a while.

DET. LT. LIZZANO: I called there yesterday and GPU says that the bills are in James Allegro's name. But you have been paying them? What's that?

CALLER: *If you look into it you will see that he has been out for [a] year, over a year he's been out of there.*

DET. LT. LIZZANO: You been paying them?

CALLER: I want to let you know something. I think somebody set. I don't think it was electrical. *I think somebody went into rob me.*

. . . .

DET. LT. LIZZANO: *So everything in there is just yours? It's got nothing to do with Jimmy or anybody else.*

CALLER: *It has nothing to do with anybody, nobody.*

DET. LT. LIZZANO: *Just you?*

CALLER: *Just me. All right?*

[ (Emphasis supplied).]

---

[3] The grand jury indictment refers to defendant as "William J. Allegro," AKA [also known as "]Skip.["]

[4] "Jimmy" refers to defendant's brother, James Allegro, to whom the certificate of occupancy for the garage apartment originally was issued.

Defendant did not testify on his own behalf. He did, however, tender the testimony of his brother, James, who testified that he had rented the garage apartment, that he had lived there for several years, that he had moved to Ocean Township and taken his furniture and belongings with him, and that his brother—defendant—had moved in to the garage apartment. He explained that, while he lived in the garage apartment, the electrical service was in his name, but that he had "switched" the service to avoid being responsible for two electrical hook-ups at two separate locations simultaneously. James also testified that defendant had continued to live in the garage apartment for approximately one year, but had then moved to Belmar, near the time when James had the electrical service "switched" and some months before the fire.

Defendant also tendered the testimony of Jennifer Steibel, who explained that, although no longer involved with defendant, she had been dating defendant at the time of the fire and that she and defendant had remained together starting the evening of February 20, 1999—the night before the fire—into the next day. She also testified that, on the day of the fire, defendant had informed her that there had been a fire at the garage apartment "he used to live at in Bradley Beach."

The jury returned guilty verdicts on both counts of the indictment against defendant: one count of first-degree maintaining or operating a controlled dangerous substance production facility, in violation of *N.J.S.A.* 2C:35–4; and one count of second-degree possession of a controlled dangerous substance with intent to distribute, in violation of *N.J.S.A.* 2C:35–5(b)(10). Based on defendant's prior drug conviction, the State moved for a mandatory extended term of imprisonment pursuant to *N.J.S.A.* 2C:43–6(f), an application the trial court granted. Defendant's motion for a new trial was denied, and he was sentenced to a mandatory extended term of fifty years imprisonment, with a sixteen-year-eight-month parole ineligibility period. Defendant's conviction and sentence were affirmed on appeal and his petition for certification was denied. 175 *N.J.* 547, 816 *A.2d* 1048 (2003).

On December 30, 2003, defendant moved for post-conviction relief. An evidentiary hearing on that petition was held on June 2, 2005. During that hearing, defendant explored, among other allegations, that his trial counsel, L. Gilbert Farr, was ineffective in two respects. First, defendant claimed that Farr was under the influence of drugs or pending disciplinary charges during the trial.[5] Second, defendant alleged that Farr had failed to prepare and present several witnesses defendant claimed would establish his innocence by showing that, at the time of the fire, defendant lived in Belmar, and not at the garage apartment in Bradley Beach. In particular, three of defendant's friends and another ex-girlfriend testified that, had they been called to testify at defendant's trial, each would have testified that defendant had moved from the Bradley Beach garage apartment in 1998 and was living in Belmar when the fire occurred in February 1999.

Oral argument was heard on the petition on August 5, 2005 and, that same day, the PCR judge—who also was the trial judge for defendant's trial—denied defendant's application in its entirety. Specifically in respect of the allegation that defendant's trial counsel was ineffective due to his drug use during trial, the PCR

---

[5] As the PCR court later noted, "Mr. Farr was suspended from the practice of law on October 31st of 2000 [seven weeks after the jury's verdict in this case], thus requiring [substitute counsel] to take his place at the sentencing[.]" *See In re Farr*, 165 *N.J.* 540, 761 *A.2d* 89 (2000) (order temporarily suspending Farr from practice of law). It explained that Farr was suspended "for among other things gross neglect and lack of diligence [and that h]e was permanently disbarred on February 25th of 2004." *See In re Farr*, 178 *N.J.* 458, 841 *A.2d* 906 (2004) (order disbarring Farr for gross neglect, engaging in a pattern of neglect, lack of diligence, failure to communicate, charging an unreasonable fee, failure to provide written fee agreement, failure to safeguard client property, negligent misappropriation of client funds, failure to maintain required attorney books and records, improper termination of representation, failure to disclose material fact to tribunal, failure to cooperate with ethics authorities, commission of a criminal act that reflects adversely on lawyer's honesty, trustworthiness or fitness, conduct involving fraud, dishonesty, deceit or misrepresentation, and conduct prejudicial to the administration of justice, in violation, respectively, of *R.P.C.* 1.1(a), *R.P.C.* 1.1(b), *R.P.C.* 1.3, *R.P.C.* 1.4, *R.P.C.* 1.5(a), *R.P.C.* 1.5(b), *R.P.C.* 1.15, *R.P.C.* 1.15(a), *R.P.C.* 1.15(d), *R.P.C.* 1.16(d), *R.P.C.* 3.3(a)(5), *R.P.C.* 8.1(b), *R.P.C.* 8.4(b), *R.P.C.* 8.4(c) and *R.P.C.* 8.4(d)).

judge ruled that "I saw no evidence of any drug use during the course of the trial." He emphasized that "I certainly didn't observe any of that, trial counsel's ineffectiveness due to drug use at the time of the trial." He explained that "the Court is satisfied that certainly his performance at trial in the courtroom in front of this Court was adequate[,]" concluding that "he really did an effective job during the course of the trial at least as it appeared before this Court." And, in respect of the witnesses who were not called, the PCR judge concluded that it did not "feel that if any of these witnesses were called, they would have made a difference in this particular case, [or] that it prejudiced the defendant." In the PCR court's view, "[t]heir testimony was really [ ] cumulative of what was already offered [a]nd all of these witnesses had a particular motive one way or another to testify in defendant's behalf." The PCR court summed up its ruling as follows: "what this case comes down to in reality is that at least in the Court's mind, the defendant was guilty of what he was charged with at trial. He got a fair trial."

Defendant timely moved for reconsideration pursuant to *R.* 1:7–4(b), and oral argument on that motion was heard on October 7, 2005. The court zeroed in on "the only issue that has caused the Court concern[, that] is[,] defense [c]ounsel's alleged lack of preparation for trial." It explained that, in its August 5, 2005 decision, it had "found that defense [c]ounsel didn't investigate his case properly, that he hadn't interviewed these witnesses, [or] made arrangements to call them for trial." It further emphasized that its August 5, 2005 decision reflected "the Court's view [that] this lack of preparation didn't prejudice the defendant." It nevertheless noted that "this is the issue that the Court would like to revisit on this reconsideration of the decision of August 5th, 2005."

Exhibiting its "discomfort with the sentence imposed"—what the court described as "follow[ing] our sentencing law to what this Court believed is an unjust result"—the PCR court on reconsideration framed the issue thusly: "Is competence exhibited when defendant's [c]ounsel does not interview any of defendant's wit-

nesses prior to the trial, nor make any attempt to have them available for trial?" It targeted the Appellate Division's earlier description of this case as "a classic credibility contest to be assessed by the jury[,]" and reiterated "the cumulative nature of the witnesses' testimony, and also ... certain motivations the witnesses may have had." It concluded, though, that "in a 'classic case of credibility,' the trial jury should have had the opportunity to hear and evaluate these witnesses." It reasoned that

> [b]ecause of Mr. Farr's lack of diligence and neglect, these witnesses were not heard by the jury. Mr. Farr could not make an informed decision not to call them, or at least call some of them, because he never interviewed them to find out what they had to say.
>
> The level of Mr. Farr's incompetence in not properly preparing for the trial undermines this Court's confidence in the ultimate outcome of this case.

It therefore reversed its earlier denial of defendant's petition for post-conviction relief, vacated defendant's convictions and sentence, and ordered a new trial. On the State's application, the court granted a limited stay of its determinations pending an interlocutory appeal.

The Appellate Division granted the State's motion for leave to appeal and, by a divided panel, reversed and reinstated defendant's convictions and sentence. The majority of the panel explained that "the trial judge concluded that Farr was ineffective because he failed to present [defendant's three friends and an ex-girlfriend] as witnesses at the trial." According to the panel's majority, the PCR court had "reasoned that, because this matter involved a 'classic credibility contest,' a jury should have been given an opportunity to evaluate the testimony of these witnesses." The majority of the panel was unwilling to accept that reasoning, instead concluding that it "disagree[d] with the judge's conclusion that Farr's failure to produce these witnesses rises to the level of the ineffective assistance of counsel."

According to the panel's majority, "the State presented overwhelming evidence that on February 21, 1999, the garage apartment at 408 Monmouth Avenue was being used as a facility for the manufacture of marijuana and the marijuana in the apartment was

possessed for purposes of its distribution." It further noted that "[t]he State additionally presented evidence upon which the jury reasonably could find that defendant maintained the manufacturing facility and possessed the marijuana on February 21, 1999." Addressing the witnesses not called to testify on defendant's behalf, the panel reasoned that, under the *Strickland/Fritz* standard, defendant "was required to establish that it was reasonably probable the jury would have reached a different verdict if Farr had called [defendant's three friends and ex-girlfriend] as witnesses" and that it was "satisfied that defendant failed to do so."

As analyzed by the panel, "[t]he testimony that would have been provided by [defendant's three friends and an ex-girlfriend] would have been essentially the same as the testimony that the jury heard from James [defendant's brother] and Steibel [defendant's girlfriend at the time of the fire]." It highlighted that "[e]vidence that is merely cumulative or repetitive does not create a reasonable probability that, had such evidence been presented at trial, the jury would have reached a different verdict." The panel also focused on the fact that those witnesses "did not have personal knowledge concerning the key issue in this case: whether defendant continued to rent and maintain the apartment in Bradley Beach even though he had moved his personal belongings and was apparently living in an apartment in Belmar." The panel observed that

these witnesses did not contradict the testimony that had been provided by Nutting [the renter of the home in front of the garage rented by defendant] and Reyal [the owner/landlord] at the trial. Nor did they contradict [Det. Lt.] Lizzano's testimony that defendant called the Bradley Beach police, [and] stated that the matter involved only him, thereby implicitly admitting that he maintained the marijuana production facility and possessed the contents of the apartment.

Judge Fisher dissented. In his view, "[t]he fact that a witness has provided testimony on an issue does not automatically render cumulative and excludable the testimony of other persons on that same issue." He explained that "[s]uch evidence does not become repetitive and wasteful of time when presented by individuals whose ability to perceive and convey learned or observed information differs from what was learned, observed or conveyed by other

persons who were permitted to testify[,]" noting that this is so "particularly when this information relates to a critical aspect of the case." In sum, Judge Fisher perceived "no merit in an argument that the testimony of five persons who possessed relevant evidence that would tend to divorce defendant from the Bradley Beach apartment could be legitimately excluded because two other persons testified on the same issue." [6]

Based on that dissent, defendant appealed to this Court as of right. *N.J. Const.* art. VI, § V, ¶ 1(b); *R.* 2:2–1(a)(2).

## II.

Defendant appeals, asserting that proper deference is due the trial court's finding that defendant's trial counsel was ineffective to the point of depriving defendant a fair trial, and that the testimony of his proffered witnesses was not cumulative and was relevant to the defense.

The State counters that the Appellate Division correctly reinstated defendant's conviction. In the State's view, defendant failed to meet either the "deficient performance" or "prejudice" prongs needed to establish ineffective assistance of counsel under the *Strickland/Fritz* test.

## III.

### A.

██ Recently, we reaffirmed the two-pronged standard by which ineffective assistance of counsel claims are gauged. We have explained that

---

[6] Although the list of uncalled witnesses on this point—which consists of defendant's three friends and a former girlfriend, for a total of four—does not conform with the dissent's assertion that there were five witnesses who were not called, that numerical inconsistency ultimately is irrelevant to our disposition of this case.

[i]n determining whether any deficiencies in trial or appellate counsel's representation have undermined a defendant's constitutional right to counsel, we have generally relied on the standards enunciated in *Strickland v. Washington* [.] In *Strickland*, the United States Supreme Court established a two-prong test for assessing such claims. A defendant must show: (1) that counsel's performance fell below an objective standard of reasonableness, and (2) that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.

[*State v. Loftin*, 191 *N.J.* 172, 197–98, 922 *A.*2d 1210 (2007) (citations, internal quotation marks and editing marks omitted).]

And, we have incorporated the *Strickland* standards into New Jersey's jurisprudential framework. *State v. Fritz*, 105 *N.J.* 42, 519 *A.*2d 336 (1987). Thus, in order to sustain a claim of ineffective assistance of counsel, two separate elements must coalesce: a defendant must prove an objectively deficient performance by defense counsel, *and* that such deficient performance so inured to the defendant's prejudice that it is reasonably probable that the result would be altered.

■■■■ "The first prong of the test is satisfied by a showing that counsel's acts or omissions fell outside the wide range of professionally competent assistance considered in light of all the circumstances of the case." *State v. Castagna*, 187 *N.J.* 293, 314, 901 *A.*2d 363 (2006) (citation and internal quotation marks omitted). In the application of that first prong, " '[n]o particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant.' " *Ibid.* (quoting *Strickland, supra,* 466 *U.S.* at 688–89, 104 *S.Ct.* at 2065, 80 *L.Ed.*2d at 694). In contrast, "there is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance [and that, t]o rebut that strong presumption, a defendant must establish that trial counsel's actions did not equate to sound trial strategy." *Ibid.* (citations and internal quotation marks omitted). In gauging whether a valid claim of ineffective assistance of counsel has been presented, "the court must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of

the time of counsel's conduct." *Ibid.* (citation and internal quotation marks omitted). For that reason,

> an otherwise valid conviction will not be overturned merely because the defendant is dissatisfied with his or her counsel's exercise of judgment during the trial. The quality of counsel's performance cannot be fairly assessed by focusing on a handful of issues while ignoring the totality of counsel's performance in the context of the State's evidence of defendant's guilt. As a general rule, strategic miscalculations or trial mistakes are insufficient to warrant reversal except in those rare instances where they are of such magnitude as to thwart the fundamental guarantee of a fair trial.
>
> [*Id.* at 314–15, 901 A.2d 363 (citations, internal quotation marks and editing marks omitted).]

*Strickland's* second prong "is satisfied by a defendant's showing that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *Id.* at 315, 901 A.2d 363 (quoting *Strickland, supra,* 466 *U.S.* at 694, 104 *S.Ct.* at 2068, 80 *L.Ed.*2d at 698). That second prong—"that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different[,]" *Loftin, supra,* 191 *N.J.* at 198, 922 A.2d 1210—is an exacting standard: "[t]he error committed must be so serious as to undermine the court's confidence in the jury's verdict or the result reached." *Castagna, supra,* 187 *N.J.* at 315, 901 A.2d 363 (citation omitted). It is to the separate application of the two prongs of this standard that we now turn.

### B.

Defendant asserts that he satisfies the "deficient performance" prong of the *Strickland/Fritz* standard by claiming that Farr was under both the influence of drugs and pending disciplinary charges at the time of defendant's trial. Indeed, defendant alleges that these two are intertwined as, according to defendant, the root cause of Farr's disciplinary problems was his alleged drug abuse.

However, the PCR judge, who also served as the trial judge in defendant's trial, saw no evidence of drug use or abuse by Farr during the trial and conclusively dispelled that notion. When

raised as part of defendant's petition for post-conviction relief, the PCR court noted that it "saw no evidence of any drug use [by Farr] during the course of the trial" and that, in the end, "the Court is satisfied that certainly his performance at trial in the courtroom in front of this Court was adequate." The PCR court summed up defense counsel's trial performance with these words: "he really did an effective job during the course of the trial at least as it appeared before this Court." Without more, then, defendant's allegation that Farr was drug-dependent when he represented defendant is insufficient to warrant post-conviction relief. *See State v. Green,* 274 *N.J.Super.* 15, 29–31, 643 *A.*2d 18 (App.Div.), *certif. denied,* 137 *N.J.* 312, 645 *A.*2d 141 (1994) (declining to adopt per se rule of ineffective counsel based on trial counsel's substance dependence).

Defendant's assertion that Farr's competence was presumptively impeached because he was subject to disciplinary proceedings contemporaneously with his representation of defendant presents a question that has been addressed persuasively elsewhere. Other jurisdictions consistently have held that a defense counsel's pending disciplinary proceedings, even those that ultimately result in counsel's suspension or disbarment, are insufficient to create a per se presumption of ineffective counsel. *See, e.g., Young v. Runnels,* 435 *F.*3d 1038, 1040 (9th Cir.) (no presumption of prejudice when counsel found unfit, and later disbarred, for conduct occurring prior to representation of defendant), *cert. denied,* —— *U.S.* ——, 127 *S.Ct.* 579, 166 *L.Ed.*2d 433 (2006); *Vance v. Lehman,* 64 *F.*3d 119, 123 (3d Cir.1995) (no presumption of prejudice when counsel's license was revoked shortly after trial ended because counsel lied on bar application), *cert. denied,* 516 *U.S.* 1060, 116 *S.Ct.* 736, 133 *L.Ed.*2d 686 (1996); *United States v. Williams,* 934 *F.*2d 847, 851–52 (7th Cir.1991) (no presumption of prejudice when counsel suspended for professional misconduct unrelated to defendant's trial); *United States v. Mouzin,* 785 *F.*2d 682, 698–99 (9th Cir.) (no presumption of prejudice when trial counsel was disbarred during trial for conduct related to other matters), *cert. denied. sub nom. Carvajal v. United States,* 479

*U.S.* 985, 107 *S.Ct.* 574, 93 *L.Ed.*2d 577 (1986); *United States v. Hoffman,* 733 *F.*2d 596, 599 (9th Cir.) (no presumption of prejudice when trial counsel was suspended in state court for conduct unrelated to representation in federal court), *cert. denied,* 469 *U.S.* 1039, 105 *S.Ct.* 521, 83 *L.Ed.*2d 409 (1984); *State v. Smith,* 476 *N.W.*2d 511, 513 (Minn.1991) (no presumption of prejudice when trial counsel was suspended for conduct unrelated to representation of defendant).

We see no reason to depart from that unbroken line of precedent.[7] We therefore conclude that the allegations of defense counsel's drug use or disciplinary problems are, standing alone, insufficient to establish that defense counsel's performance fell below an objective standard of reasonableness, as required under the first prong under the *Strickland/Fritz* standard.

### C.

Even if one assumes that defendant's proofs are sufficient to establish that Farr's performance did not meet the objective standard of reasonableness required for competent counsel, defendant nonetheless fails to establish *Strickland/Fritz's* second prong: that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. In a nutshell, defendant asserts that, had Farr presented an additional four witnesses who would have testified that defendant lived in Belmar at the time of the fire in the garage apartment in Bradley Beach, the jury would have acquitted defendant. We disagree.

At the outset, we note that no part of the State's case hinged on whether defendant was living at the Bradley Beach garage apartment at the time of the fire; as far as the State's case was

---

[7] In the related context of the suspension of a law license for financial reasons, at least one New Jersey court has held likewise, explaining that "[t]he reasons for suspension can be so varied in kind and degree that imposition of a per se rule is inappropriate." *Green, supra,* 274 *N.J.Super.* at 28, 643 *A.*2d 18.

concerned, defendant could have lived anywhere. In this context, neither the presented testimony of defendant's brother and ex-girlfriend, nor the tendered testimony of defendant's three friends and another ex-girlfriend directly or tangentially address the State's proofs as presented by the police investigator, the fire marshal/code enforcement officer, the neighbor, the landlord or, for that matter, defendant's own recorded statement: that defendant was solely responsible for the marijuana growing facilities and the marijuana located at the garage apartment at 408 Monmouth Avenue.

Further, in determining whether those additional witnesses are sufficient to prove to a reasonable probability that, absent counsel's failure to call those witnesses, the outcome of defendant's trial would have been different, we are guided, in part, by the standard applicable to claims of newly discovered evidence, that is, "that the evidence 'would probably change the jury's verdict if a new trial were granted.'" *State v. Ways*, 180 *N.J.* 171, 187, 850 *A.*2d 440 (2004) (quoting *State v. Carter*, 85 *N.J.* 300, 314, 426 *A.*2d 501 (1981)). In that respect, we cannot conclude to a reasonable probability that the presentation of those witnesses would have affected the outcome of defendant's case. On the contrary, defendant's belatedly tendered witnesses well could have been harmful to him at trial. For example, the owner/landlord of the entire premises and the tenant of the home in the front of the garage apartment testified that, at the time of the fire, defendant was driving a white truck that they repeatedly saw at the apartment. Seeking to cast doubt on defendant's on-going connection to the apartment, defendant's brother and ex-girlfriend testified at trial that, as of the date of the fire, defendant was driving a blue truck. However, at the PCR hearing, defendant's new witnesses testified that, at the time of the fire, defendant was driving a white—and not a blue—truck, thereby corroborating the State's case and contradicting defendant's trial witnesses. We therefore conclude that the absence of those witnesses from defendant's trial could not have created a reasonable probability that, but for Farr's

failure to investigate and tender these witnesses, the result of defendant's trial would have been different.[8]

## IV.

Although not raised in the dissent, the Appellate Division also addressed the remainder of the assertions defendant advanced in support of his petition for post-conviction relief[9] and concluded that "the judge correctly disposed of defendant's other claims regarding Farr's performance as trial counsel." In respect of defendant's claim that his counsel was ineffective in plea discussions and negotiations, the panel explained that

---

[8] We reject the Appellate Division's earlier reference that this case presented a "classic credibility contest" as well as the motion court's later reliance on that description. The relevant proofs in this case were and remain uncontroverted: regardless of where defendant may have then been living, defendant had possession of the garage apartment and he admitted that the contents of the apartment were his and his alone.

[9] We acknowledge that this appeal is before us as an appeal as of right, R. 2:2-1(a)(2), and, hence, the issues before us should be confined to those raised in the dissent below. We also acknowledge that the dissent only addressed the issues discussed in Part III of this opinion. However, procedurally, defendant first filed a notice of petition for certification of "the entire judgment entered by the Appellate Division[,]" which was later amended to seek "an Order certifying the judgment rendered two to one in favor of the State entered by the Appellate Division[.]" Upon inquiry of the Court, defendant was advised that the dissent in the Appellate Division entitled him to an appeal as of right. Acting on that advice, defendant withdrew his notice of petition for certification and filed, instead, a notice of appeal "of the Appellate Court of New Jersey's majority decision."

A notice of appeal based on a dissent in the Appellate Division preserves for review only those issues on which the dissent was filed, and certification must be sought separately as to all other issues. See Aversano v. Palisades Interstate Parkway Comm'n, 180 N.J. 329, 332, 851 A.2d 633 (2004). We have explained that, "where there is a dissent in the Appellate Division, the scope of the appeal (absent other considerations) is limited to those issues encompassed by the dissent." Gilborges v. Wallace, 78 N.J. 342, 349, 396 A.2d 338 (1978). We conclude that the facts present here certainly comprise sufficient "other circumstances" to merit the exercise of our jurisdiction in this case and, for that reason, we consider, but do not decide, defendant's additional arguments.

defendant was properly advised concerning the consequences of his rejection of the State's plea offer. The judge found that defendant "knew what the situation was" and noted that defendant was no stranger to the criminal justice system. The judge stated that defendant's assertion that he did not "understand the ramifications of what he was doing" was "hard for the Court to accept." The judge's finding was one that could reasonably have been reached based on the evidence in the record.

Based on the existing record, we are constrained to disagree with that conclusion.

Our independent review of the evidentiary portions of the PCR proceedings already allowed by the PCR court does not fully satisfy the question whether Farr was ineffective during plea discussions and negotiations. Defendant alleged, without contradiction, that Farr did not adequately prepare for the plea cut-offs and that Farr misrepresented to defendant the import of the plea cut-offs. Particularly in respect of his rejection of several favorable plea offers made by the State, defendant claimed that he would have accepted those offers but that trial counsel advised him not to do so and that a plea deal was available up to the time of trial. In respect of his extended term sentence, defendant also testified that, although he had heard it explained and was "a little shocked" by it, his counsel specifically told him not to worry, that it was a "scare tactic." Juxtaposed against those claims is the transcript of the final plea cut-off proceeding, where defendant—in direct colloquy with the trial court—represented that he understood the proceedings and intentionally rejected the pending plea offer.

What makes defendant's claims more troublesome is that Farr was disbarred for conduct substantially similar to that alleged by defendant in respect of the plea discussions and negotiations. We also recognize that the record on the specific point of whether Farr was ineffective in respect of the plea deals is less than complete. For those reasons, we remand the cause to the Law Division limited to a more robust exposition of the facts surrounding defendant's claims in respect of his rejection of the plea offers, and the PCR court's conclusions based on that more comprehensive record.

## V.

The judgment of the Appellate Division is affirmed in part and reversed in part, and the cause is remanded to the Law Division for further proceedings consistent with this opinion.

*For affirmance in part/reversal in part/remandment*—Chief Justice RABNER, Justices LONG, LaVECCHIA, ALBIN, WALLACE, RIVERA–SOTO and HOENS—7.

*Opposed*—None.