**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0346-22

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

RASUL MCNEIL-THOMAS,

    Defendant-Appellant.

_____

Submitted October 12, 2023 – Decided November 15, 2023

Before Judges Vernoia and Walcott-Henderson.

On appeal from the Superior Court of New Jersey, Law Division, Essex County, Indictment No. 12-06-1570.

Joseph E. Krakora, Public Defender, attorney for appellant (Steven M. Gilson, Designated Counsel, on the brief).

Theodore N. Stephens II, Acting Essex County Prosecutor, attorney for respondent (Frank J. Ducoat, Special Deputy Attorney General/Acting Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

A jury convicted defendant Rasul McNeil-Thomas of aggravated manslaughter, conspiracy to commit carjacking, carjacking, conspiracy to commit murder, attempted murder, aggravated assault, and related weapons offenses. The court imposed an aggregate sixty-year sentence. We reversed the convictions, State v. McNeil-Thomas, No. A-4859-14 (App. Div. Dec. 8, 2017) (slip op. at 29), and, after granting defendant's petition for certification, State v. McNeil-Thomas, 234 N.J. 200 (2018), the Supreme Court reinstated defendant's convictions, State v. McNeil-Thomas, 238 N.J. 256, 281 (2019).

Defendant appeals from an order entered following an evidentiary hearing denying his post-conviction relief (PCR) petition, which alleged ineffective assistance of trial counsel. We affirm because the PCR court's findings of fact and credibility determinations are supported by substantial credible evidence, and defendant did not establish by a preponderance of the evidence that either trial counsel's performance was deficient or a reasonable probability that but for counsel's purported errors, the result of the trial would have been different.

I.

The charges against defendant arise out of a May 26, 2011 drive-by shooting in Newark at the Texas Fried Chicken & Pizza restaurant, which is also known as the "Chicken Shack." McNeil-Thomas, 238 N.J. at 261. As off-duty

A-0346-22

Newark police officer William Johnson stood inside the Chicken Shack waiting for a slice of pizza, the restaurant's exterior surveillance camera captured a silver Chevrolet Malibu drive slowly past the establishment. Ibid. The camera's recording also showed "a distinct muzzle flash emanating from the front passenger window of the car as several rounds were fired into the restaurant." Id. at 262.

One of the bullets fired from the Malibu struck Johnson and caused his death. Ibid. Three of the restaurant's other patrons were also wounded. Ibid. A surveillance recording from a nearby restaurant, Bobby's Restaurant, showed the Malibu had turned off the street on which the Chicken Shack is located, and had traveled in the direction of where it was later found abandoned "four blocks from the scene of the shooting and around the corner from defendant's residence." Ibid. Surveillance recordings from Saint Peter's Park, which is located between the place the Malibu was found and defendant's residence, showed two African American males "wearing hoodies walking through the park toward defendant's residence immediately after the shooting." Ibid. A police K-9 unit subsequently tracked a scent from the Malibu's driver seat through the park and directly past defendant's residence. Ibid.

A-0346-22

The Malibu had been carjacked moments prior to the drive-by shooting from the driveway of a home "located . . . only a block-and-a-half away" from the Chicken Shack. Ibid. Marlena Gordon, the victim of the carjacking, testified she was sitting in the front passenger seat of the idling Malibu when a man ordered her out of the vehicle "by tapping his gun on the driver's side window." Ibid. When Gordon exited the vehicle, "she saw a second man standing about a foot-and-a-half away from her wearing a hoodie" that had "the outline of a gun" in it. Ibid. Moments later, as she reached the steps of the home where the car had been parked, she heard the vehicle "speeding out of the driveway," and then, "[s]econds later, she heard the sound of gunshots coming from the [C]hicken [S]hack from down the block." Id. at 263.

Seven hours after the incident, the police showed Gordon a photo array, but she was unable to make an identification. Ibid. Later the same day, the police showed Gordon the same array and she selected defendant's photograph and identified him as the individual who had worn the hoodie when the Malibu was hijacked. Ibid.

Two witnesses, present at the Chicken Shack when the shooting occurred, also identified defendant. Ibid. The first, Marissa Tarry, had gone to high school with defendant and had known him for five years. In a statement

A-0346-22

provided to the police in the early morning hours of the day following the shooting, Tarry said she was standing outside the Chicken Shack and locked eyes with an individual she identified as defendant, who she said had been driving the Malibu and had fired shots out of the passenger side window.

Tarry also told the police that during the hours prior to the shooting she and a group of other women had been involved in a physical altercation with members of defendant's family outside defendant's residence. Tarry explained that following the altercation, and minutes before the shooting, defendant had called her and said, "it ain't have to happen like that. You could have stopped your girls." Tarry later selected defendant's photograph from an array presented by the police and identified him as "one of the shooters." Ibid.

During her testimony at trial, Tarry explained she "did not want to get involved with the investigation because she was too scared to come forward." Ibid. She also admitted using one "deck" of heroin nine hours prior to the shooting and testified "she was not under the influence at the time of the shooting." Ibid.

The second witness present at the Chicken Shack, Tonya Jones (Tonya),[1] knew defendant and his family prior to the shooting. Ibid. According to Tonya, she stood in the Chicken Shack's doorway facing the street as the Malibu approached. Ibid. In a recorded statement with police hours after the shooting, Tonya reported that she had locked eyes with defendant as the Malibu passed the Chicken Shack. Ibid. Tonya selected defendant's photograph from an array and identified defendant as one of the individuals involved in the shooting.[2] Ibid.

The evidence at trial further demonstrated that about an hour prior to the shooting, "a street brawl took place in front of defendant's home between defendant and his family and a group of women." Id. at 264. The group of women consisted of Tarry, Ashley Lamar, Cierra Wright, and Taheeda.[3]

Defendant was present for the brawl outside his home. Defendant's mother Keashea Jones, sister Jasmine McNeil, and stepfather Bobby Jones, also

---

[1] We refer to Tonya by her first name to avoid confusion with others who share the same surname. We intend no disrespect in doing so.

[2] Tonya recanted her statement to the police at trial, but the court admitted the recorded statement following a hearing pursuant to State v. Gross, 98 N.J. Super. 98 (App. Div. 1987). Ibid.

[3] The record does not disclose Taheeda's surname. We intend no disrespect in in our referring to her by her first name.

A-0346-22

participated in the brawl.[4]  The trial evidence showed Keashea suffered injuries during the brawl, including two black eyes.  Three of the women in the group that fought the members of defendant's family, including Tarry, were at the Chicken Shack at the time of the shooting.  Ibid.  A theme of the State's arguments to the jury at trial was that the shooting at the Chicken Shack was in retaliation for the "earlier assault" by the group of women against "defendant and his family."  Ibid.

Ronesha Scales lived across the street from defendant's home.  Scales testified she called 9-1-1 to report the "street brawl" between defendant's family and the group of women, and she saw defendant and Bobby Jones leave defendant's home in a blue pickup truck shortly after the brawl ended.  Ibid. According to Scales, she saw the two men return home, but defendant was in a different vehicle, "a black sedan" she described as "like a Cadillac CTS," with

---

[4]  At the time of the May 29, 2011 brawl and later shooting, defendant's mother's name was Keashea Luder, and Bobby Jones was not defendant's stepfather. Two days after the brawl and shooting, defendant's mother married Bobby Jones. For purposes of clarity and ease of reference, we have identified defendant's mother as Keashea Jones and we refer to Bobby Jones by his full name or as defendant's stepfather.  In addition, throughout the balance of this opinion, we refer to Keashea Jones as Keashea because she shares a surname with Bobby Jones and Tonya Jones.  We intend no disrespect in doing so.  We refer to Bobby Jones by his full name to avoid confusion with the Bobby's Restaurant to which we also make reference in the opinion.

three other individuals, and Bobby Jones separately returned in the pickup truck. Ibid.

Scales further testified that a short time later, defendant and another individual got in the black sedan and drove off while following Bobby Jones in the blue pickup truck. Ibid. During the investigation following the shooting and defendant's arrest, the police photographed Bobby Jones's blue pickup truck, which had "custom fender flares and a damaged rear bumper." Ibid.

The State presented surveillance video recordings from the Chicken Shack that showed a "pickup truck pass the restaurant shortly before the shooting, followed by a black sedan." Ibid. Further, a video recording from Bobby's Restaurant, that was played for the jury during the testimony of the State's lead investigator, also "showed a sedan following a pickup truck down" the street "only seconds after the two vehicles would have passed" the Chicken Shack. Id. at 274.

During its summation at trial, the State played "a brief segment of" the Chicken Shack video recording showing the pickup truck followed by the sedan, and the assistant prosecutor argued the recording, coupled with Scales' testimony, established defendant drove past the Chicken Shack prior to the shooting for the purpose of identifying Tarry and the other women who had

earlier attacked defendant's family during the brawl. The State argued the recording established that defendant and Bobby Jones had driven past the restaurant "in search of the young women from the brawl and that, finding them there, defendant carjacked the Malibu and returned to shoot them." Id. at 264.

On his direct appeal, defendant asserted the State's arguments based on the video recording from the Chicken Shack were improper because the recording had not been admitted into evidence and the prosecutor therefore "improperly linked defendant to one of the vehicles shown in the video segment." Id. at 261.

The Supreme Court rejected defendant's arguments, finding the recording played during the State's summation had been admitted in evidence. Ibid. The Court further held that the prosecutor's comments, asserting the jury should infer the recording "showed defendant in one of the vehicles, following [Bobby Jones] in another, driving by the restaurant shortly before the shooting," constituted "reasonable and fair inferences supported by the evidence presented at trial." Ibid. Thus, as noted, the Court affirmed defendant's convictions. Id. at 281.

Following disposition of his direct appeals, defendant filed a verified PCR petition generally asserting ineffective assistance of trial and appellate counsel and prosecutorial misconduct. Defendant later submitted an affidavit asserting

he was at his home for a celebration of Keashea and Bobby Jones' upcoming nuptials at the time of the shooting, and trial counsel was ineffective by failing to speak to, and call as alibi witnesses at trial, others present at his home during the celebration.

In support of the petition, defendant further asserted that prior to trial he had seen only the video recordings showing the actual shooting, and he had not seen the portions of the recordings showing the "blue truck and black car" the State relied on at trial. Defendant stated that had he known trial counsel was not going to call alibi witnesses, he would have testified in his own defense "especially given the fact that a witness," Scales, who defendant claimed he "never knew about[,] placed [him] into a black car and away from [his] house around the time of the shooting."

The PCR court conducted an evidentiary hearing on the PCR petition at which trial counsel, Bobby Jones, Keashea, Jasmine McNeil, Mone' Landrum, and defendant testified. Trial counsel testified concerning his vast experience as a criminal defense attorney, and he explained the reasons he had opted not to call any alibi witnesses at trial. Counsel also testified he erred in his representation of defendant by failing to review, prior to trial, all portions of the

video recordings, which he conceded had been provided by the State in discovery before trial.

More particularly, counsel acknowledged that during their initial interview following defendant's arrest, defendant said he was home the "whole night" of the shooting with many family members and friends because they were preparing for, and celebrating, his mother Keashea's upcoming marriage to Bobby Jones that was scheduled for two days later. Counsel testified he interviewed three of the potential alibi witnesses—he could not recall their names—but opted not to provide the State with notice of an alibi defense, in part, because some of the witnesses stated defendant was home the entire evening of May 26, 2011, and others stated defendant had left the home for a short period of time with Bobby Jones during the evening of the shooting.

Counsel further explained he chose not to rely on an alibi defense because he determined some of the putative alibi witnesses could have exposed defendant to culpability for Johnson's homicide as "an accomplice"—more particularly, as the individual who was familiar with the group of women, including Tarry, that had attacked his family and who left the home with Bobby Jones to identify the women at the Chicken Shack so that their location could be provided to the shooters. Counsel also testified putative alibi witnesses, such as

11

Bobby Jones and Rowe, could "have placed [defendant] in jeopardy of being someone who would have been an accomplice," and counsel determined he "didn't want to go there."

Counsel's concern about calling putative alibi witnesses who might provide testimony establishing defendant was involved in the shooting as an accomplice was also based in part on a statement provided to the police by Antoine Terry, who served as Bobby Jones' best man at the scheduled nuptials and who told the police he was at defendant's home following the shooting. In a statement to the police, Terry reported that following the shooting, Bobby Jones had indicated someone—"little homies"—participated in the shooting, but that "people [had] pointed out to" Bobby Jones that the women "involved in the fight" were at the Chicken Shack and Bobby Jones then arranged the shooting.

Counsel testified at the PCR hearing he was concerned that if he called the putative alibi witnesses, either they would testify, or the State would call other individuals who had been at defendant's home that evening, who would testify defendant and Bobby Jones had left the home together in Bobby Jones' pickup truck at a time after the brawl. Counsel was concerned such testimony, coupled with the State's ability to call Terry as a witness, would support an alternative theory of guilt against defendant—that he was the individual who

pointed out to Bobby Jones that the women were at the Chicken Shack and the women became targets of the shooters at that location as a result.

Counsel explained he "absolutely" wanted to avoid any testimony that created a potential for the introduction of evidence supporting a claim defendant "pointed out the individuals to be shot."[5] Counsel explained that although there were putative witnesses who would have testified defendant never left the home on the evening of the shooting, there were others who would have testified he left the home with Bobby Jones in Jones' pickup truck. Counsel sought to avoid the latter group of witnesses because they would have provided grounds for defendant's criminal culpability as an accomplice that the State, in the absence of those witnesses, did not focus upon.

Counsel also determined the putative alibi witnesses were unnecessary because the State claimed defendant was the shooter and counsel considered the State's identification evidence of defendant as a shooter to be weak. Counsel

---

[5] Counsel also explained that a woman identified as defendant's then-girlfriend, Najalah Rowe, was present at his home on the evening of the shooting and provided a statement to the police. According to counsel, in her statement, Rowe said defendant left the home with Bobby Jones during the evening and that based on what defendant said, she "assumed" he pointed out to Bobby Jones the women who had been involved in the brawl. Counsel explained that his decision not to rely on the putative alibi witnesses was made also, in part, as a means of eliminating the need for either party to call Rowe as a witness at trial.

explained he thereby focused on issues related to what he argued were the unreliable eyewitness identifications provided by Tarry, Tonya, and Gordon.

Counsel also considered that the alibi witnesses offered differing versions of what had occurred—with some saying defendant never left the home and others saying he left with Bobby Jones in the pickup truck—and there was a potential the defendant's case would lose credibility if his witnesses were perceived by the jury as liars. Counsel determined not to call the putative alibi witnesses because he was concerned the State would call Terry, Bobby Jones and Rowe in response, and they would present facts supporting a finding of accomplice liability.

Counsel testified he erred by limiting his review of the video recordings introduced into evidence at trial to those portions showing the Malibu driving past the Chicken Shack as the shots were fired. Counsel explained that prior to trial, he did not review the portions of the recordings showing the pickup truck followed by the black sedan shortly before the shooting. Counsel also acknowledged he had been provided with, but did not review, Scales' statement to the police prior to trial.

Asked how reviewing the complete recordings and Scales' statement prior to trial would have affected trial strategy or the trial outcome, counsel testified

14

he would have assessed the risks associated with calling alibi witnesses "differently." Counsel, however, could not offer any explanation as to how that reassessment might have changed his trial strategy or the trial outcome. Counsel also testified that had he reviewed the complete recordings and the Scales' statement prior to trial, he would have discussed with defendant calling the three alibi witnesses he had interviewed but he could not state that his decision not to call the alibi witnesses would have been different.

Counsel acknowledged that even if he had reviewed the evidence prior to trial, he would have continued to have a concern that calling defendant's family and friends, who were at the home on the evening of the shooting, would have involved presenting conflicting versions of what occurred—with some of the putative alibi witnesses saying defendant never left the home and others saying he left for a short period with Bobby Jones in the pickup truck—such that the State may have called Terry, Bobby Jones, or Rowe, whose testimony may have supported a finding defendant was guilty of the charged offenses as an accomplice.

As noted, during the PCR hearing, defendant testified and presented the testimony of Bobby Jones, Keashea, Jasmine McNeil, and Landrum. The

15

witnesses all testified concerning the brawl and the evening that followed it, during which the shooting occurred.

Following the presentation of the evidence, and the submission of post-hearing briefs, the PCR court issued a decision from the bench. The court noted the two eyewitnesses to the shooting who testified at trial, Tarry and Tonya, knew defendant personally from prior interactions they had with him. The court further explained defendant was identified by Gordon as the individual she saw wearing the hoodie after she was ordered out of the Malibu at the time it was carjacked.

The court further observed defendant testified during the PCR hearing that on the evening of the shooting he left his home with Bobby Jones and they drove around the neighborhood, and the Chicken Shack was only four or five blocks from his home. The court explained that when defendant was arrested, he told the police that on the evening of the shooting, after the brawl, he went out walking around with his friends and then returned to his home because he could not find his cousin. The court noted defendant's version of the events during his testimony at the PCR hearing, as well as his statement to the police, placed defendant in the area where the shooting occurred.

The court also determined trial counsel "made a strategic decision not to call" the putative alibi witnesses based on counsel's evaluation of the circumstances presented, including that there were various problems with the statements of the witnesses. The court explained the alibi witnesses "were inconsistent with each other . . . as to what exactly factually happened," as well as whether defendant was either present at his home on the evening of the shooting "as opposed to being out in the vehicle with Bobby Jones."[6]

The court further noted some of the putative alibi witnesses had prior criminal convictions that could have been used to impeach their credibility, and all the witnesses were friends and family of defendant whose credibility may have also been challenged on that basis. The court reasoned that one of the potential putative alibi witnesses, Rowe, put defendant out of the home and therefore in the area of the shooting when it occurred, and that Bobby Jones similarly admitted during his testimony at the PCR hearing that he and defendant left the home during the evening and drove around the neighborhood only blocks away from the shooting.

---

[6] For example, the court noted the putative alibi witnesses who testified at the PCR hearing, Bobby Jones, Keashea, Jasmine McNeil, and Landrum, offered different reasons for defendant's and Bobby Jones' departure from the home and their purpose for driving around the neighborhood during the evening of the shooting.

A-0346-22

The court found trial counsel had evaluated the issues concerning the putative alibi witnesses and considered that by calling them, "the State could have called rebuttal witnesses," including Terry and Rowe, who may have provided testimony placing defendant at the scene of the shooting or otherwise supporting a finding defendant was involved in the shooting as an accomplice.

Further, the court explained the putative alibi witnesses provided inconsistent versions of what occurred during the brawl, with some of the witnesses minimizing the violent nature of the brawl and the injuries suffered by those involved, and others acknowledging that, for example, Keashea suffered two black eyes during the brawl "the day before" her wedding after being struck with brass knuckles.[7]

The court concluded trial counsel made a strategic decision not to call the putative alibi witnesses because they would not have helped the defense and would have otherwise been "problematic." The court also determined the State

---

[7] According to the State, the evidence showing the violent nature and extent of the brawl supported its claim the shooting was in retaliation for the force used against, and injuries suffered by, defendant's family, and the shooting was directed against Tarry and the other women who had attacked defendant's family and were at the Chicken Shack when the shooting occurred. The State further argued at the PCR hearing that some of the putative alibi witnesses attempted to falsely downplay the violence and force used by the group of women who fought with members of defendant's family for the purpose of minimizing defendant's motive to retaliate.

A-0346-22

had a strong identification case based on the testimony of Tarry and Tonya, who testified they saw defendant firing shots from the Malibu, and Gordon, who saw defendant face-to-face during the carjacking and identified him in a photo array shortly after the carjacking occurred. The court found defendant did not present any evidence that had counsel reviewed Scales' statement and the complete video recordings prior to trial, the defense at trial would have been different or the result of the trial would have changed.

The court denied the PCR petition, concluding defendant failed to demonstrate that either counsel's performance at trial was constitutionally deficient or that but for any purported error, there was a reasonable probability the result of the trial would have been different. The court entered an order denying the PCR petition. This appeal followed.

Defendant presents the following argument for our consideration:

> DEFENDANT'S CONVICTIONS MUST BE REVERSED BECAUSE TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO REVIEW A VIDEO SEGMENT - ARGUABLY PLACING DEFENDANT OUTSIDE THE LOCATION AND AT THE APPROXIMATE TIME OF THE FATAL SHOOTING - PROVIDED TO HIM IN DISCOVERY, WHICH, IF REVIEWED, NECESSITATED HAVING ALIBI WITNESSES TESTIFY.

A-0346-22

II.

Where, as here, we review a decision denying a PCR petition following an evidentiary hearing, "[o]ur standard of review is necessarily deferential to a PCR court's factual findings based on its review of live witness testimony." State v. Nash, 212 N.J. 518, 540 (2013). "[W]e will uphold the PCR court's findings that are supported by sufficient credible evidence in the record," ibid., but "we need not defer to a PCR court's interpretation of the law" because "a legal conclusion is reviewed de novo," id. at 540-41.

The Sixth Amendment to the United States Constitution and Article I, Paragraph 10 of the New Jersey Constitution guarantee criminal defendants a right to the assistance of counsel. State v. Gideon, 244 N.J. 538, 549 (2021). The right to counsel includes "the right to the effective assistance of counsel." Nash, 212 N.J. at 541 (quoting Strickland v. Washington, 466 U.S. 668, 686 (1984)).

In Strickland, the Court established a two-part test, later adopted as applicable under the New Jersey Constitution in State v. Fritz, 105 N.J. 42, 58 (1987), to determine whether a defendant has been deprived of the effective assistance of counsel. Strickland, 466 U.S. at 687. Under the first prong of the Strickland standard, a petitioner must show that counsel's performance was

20

deficient. Ibid. It must be demonstrated that counsel's handling of the matter "fell below an objective standard of reasonableness" and that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Ibid.

Under the "second, and far more difficult prong of the" Strickland standard, a defendant "must show that the deficient performance prejudiced the defense." Gideon, 244 N.J. at 551 (quoting State v. Preciose, 129 N.J. 451, 463 (1992)). To establish prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 550-51 (alteration in original) (quoting Strickland, 466 U.S. at 694). Proof of prejudice under Strickland's second prong "is an exacting standard." Id. at 551 (quoting State v. Allegro, 193 N.J. 352, 367 (2008)). A defendant seeking PCR "must affirmatively prove prejudice" satisfying the second prong of the Strickland standard. Ibid. (quoting Strickland, 466 U.S. at 693).

To prevail on a PCR petition, a defendant must establish both prongs of the Strickland standard. Strickland, 466 U.S. at 687; Nash, 212 N.J. at 542. A failure to satisfy either prong of the Strickland standard requires the denial of a

PCR petition founded on an ineffective assistance of counsel claim. Strickland, 466 U.S. at 700. "With respect to both prongs of the Strickland test, a defendant asserting ineffective assistance of counsel on PCR bears the burden of proving his or her right to relief by a preponderance of the evidence." State v. Gaitan, 209 N.J. 339, 350 (2012).

Here, defendant argues the court erred by determining counsel's performance was not deficient under Strickland's first prong. More particularly, defendant contends counsel acknowledged he erred by failing to review the portions of the video recordings produced by the State during discovery, showing a black sedan following a pickup truck on the road on which the Chicken Shack was located shortly before the shooting, and by failing to review Scales' statement to the police prior to trial.

Defendant further claims the court erred in its assessment of the credibility of the putative alibi witnesses—Bobby Jones, Keashea, Jasmine McNeil and Landrum—who testified at the PCR hearing, and the court therefore erroneously concluded their testimony would not have helped defendant's case at trial and would not have affected the trial outcome. Defendant argues that had the alibi witnesses who testified at the PCR hearing testified at trial, the outcome would have been different because the eyewitness identifications of defendant made by

Tarry, Tonya, and Gordon were fraught with issues and inconsistencies and, as such, evidence of defendant's alibi would have undermined the State's case.

Defendant recognizes that a trial counsel's strategic calculations are generally insufficient to warrant reversal of a conviction "except in those rare instances where they are of such magnitude to thwart the guarantee of a fair trial." State v. Buonadonna, 122 N.J. 22, 42 (1991) (quoting State v. Dennis, 43 N.J. 418, 428 (1964)). However, he contends counsel's failure to call the alibi witnesses he presented at the PCR hearing warrants relief from his convictions because the State's identification case against him was not strong, and therefore counsel's failure to call the alibi witnesses constituted deficient performance under Strickland's first prong and resulted in prejudice under Strickland's second prong. 466 U.S. at 687. We are not persuaded by defendant's arguments and are convinced the PCR court correctly determined defendant failed to sustain his burden under both prongs of the Strickland standard.

Trial counsel candidly testified he should have reviewed Scales' statement and the complete video recordings prior to trial and erred by failing to do so. However, defendant's claim counsel's performance was deficient is not in fact based on counsel's failure to review that evidence prior to trial. Instead, defendant claims counsel's performance was constitutionally deficient because

had he reviewed the evidence prior to trial he would have, and should have, called alibi witnesses he otherwise opted not to call at trial.

Defendant's claim finds no support in the evidence and is undermined by the evidence the PCR court found credible. Trial counsel did not testify he would have called the alibi witnesses had he reviewed the complete recordings and Scales' statement prior to trial. Counsel testified only that he would have assessed the issue of calling alibi witnesses in a different manner he could not identify or describe. That is, based on counsel's testimony at the PCR hearing, the court was left with no evidence counsel would have opted to call the alibi witnesses had he reviewed Scales' statement and the complete recordings prior to trial.

Counsel did not testify that a pretrial review of the evidence would have altered his decision about the alibi witnesses, and defendant otherwise presented no evidence that a review of the evidence prior to trial would have required the calling of the alibi witnesses, such that a failure to do so would have constituted an "error[] so serious that counsel was not functioning as the 'counsel' guaranteed [to] the defendant by the Sixth Amendment," or would have established counsel's performance "fell below an objective standard of

24

reasonableness" required by effective assistance of counsel. Strickland, 466 U.S. at 687.

Counsel explained the difficult, but carefully considered, strategic decision he made not to call the alibi witnesses. Counsel detailed the problems presented by the various witnesses including: their conflicting versions of the reasons defendant and Bobby Jones left the home in the pickup truck on the evening of the shooting; their familial ties to defendant and prior criminal records that would have adversely affected their credibility and the credibility of the defense; and, most significantly, the possibility the testimony of the putative alibi witnesses would provide cause for the State to present other witnesses—Terry and Rowe—whose testimony might establish defendant's criminal culpability as an accomplice. The evidence at the PCR hearing further demonstrated the testimony of the alibi witnesses, that defendant only left home on the evening of the shooting with Bobby Jones in the pickup truck, was undermined by defendant's statement to the police that he walked around the neighborhood with his friends on the evening of the shooting.

Additionally, trial counsel explained that he viewed the State's eyewitness identifications of defendant as a participant in the carjacking and shooting as weak evidence and, as such, he focused the defense on the contention the State

25

did not present sufficient evidence of defendant's guilt as the shooter. In his brief on appeal, defendant also argues the State's eyewitness identification evidence at trial was weak, but he ignores that trial counsel testified it was because of that weakness that counsel opted not to present the alibi witnesses with the problems and credibility issues they presented, and because their putative testimony would have resulted in the presentation of evidence supporting a determination that even if defendant was not the shooter, he was guilty as an accomplice.

To sustain his burden under the first prong of the Strickland standard, defendant was required to present evidence sufficient to "'overcome a "strong presumption" that counsel exercised "reasonable professional judgment" and "sound trial strategy" in fulfilling his responsibilities.'" Nash, 212 N.J. at 542 (quoting State v. Hess, 207 N.J. 123, 147 (2011)). Here, the PCR court correctly determined defendant failed to sustain that burden because the record is devoid of evidence that had counsel reviewed Scales' statement and the complete video recordings prior to trial, it would have been an unsound trial strategy or the unreasonable exercise of professional judgment not to call the alibi witnesses. And, as noted, trial counsel did not testify he would have changed his decision

not to call the alibi witnesses if he had reviewed the statement and full recordings prior to trial.

Lacking any evidence trial counsel would have decided to call the alibi witnesses if he had reviewed Scales' statement and the complete recordings prior to trial, defendant otherwise failed to present any evidence sustaining his burden of establishing that had trial counsel reviewed that evidence, a decision not to call the alibi witness would have constituted an error so serious counsel was not functioning as the effective counsel guaranteed under the United States and New Jersey Constitution. Strickland, 466 U.S. at 687; Nash, 212 N.J. at 542. He therefore did not prove by a preponderance of the evidence that counsel's performance was deficient under the first prong of the Strickland standard.

Defendant also failed to satisfy Strickland's second prong because, as the PCR court found, he did not present evidence establishing a reasonable probability that but for counsel's alleged error in failing to call alibi witnesses, the result of his trial would have been different. Strickland, 466 U.S. at 694. In Allegro, the Court explained that in considering whether there is reasonable probability that but for trial counsel's failure to call witnesses at trial the outcome of the trial would have been different, the analysis requires application of the standard for a new trial based on newly discovered evidence: "that the

27

evidence 'would probably change the jury's verdict if a new trial were granted.'" 193 N.J. at 370 (quoting State v. Ways, 180 N.J. 171, 187 (2004)). "Determination of prejudice requires consideration of all the evidence presented at trial and the likely effect the evidence presented post-conviction would have had on the final result." Gideon, 244 N.J. at 557.

In our view, the testimony of the alibi witnesses defendant presented at the PCR hearing would not have likely affected the outcome of the trial. Each of the witnesses confirmed defendant departed from his home with Bobby Jones in the pickup truck during the evening of the shooting, and Bobby Jones' pickup truck was shown on the video recordings driving past the Chicken Shack moments before the carjacking and shooting.

Although each of the alibi witnesses testified Bobby Jones and defendant were absent from the home for only a short period of time, other evidence established defendant's home was only blocks from the scene of the shooting and defendant therefore needed only a short time to participate in the carjacking and shooting and then return home. Thus, the testimony of the witnesses did not directly undermine the State's evidence of defendant's involvement in the carjacking and drive-by shooting within blocks of his home. In fact, the testimony supported the State's claim, and is consistent with the State's other

evidence establishing that defendant participated in the carjacking and shooting. Correctly viewed as such, the putative witnesses' testimony did not establish an alibi at all.

In fact, the putative alibi witnesses' testimony better supports the State's claim defendant was not at home when the shooting took place and he therefore participated in the carjacking and shooting. As trial counsel recognized, defendant's reliance on the witnesses as establishing an alibi would likely have been viewed as the proffer of a false narrative that may have caused the jury to question the credibility of the defense's other contentions—including the primary defense that the eyewitness identification evidence was weak and unreliable and could not, on its own, support a finding of guilt. Indeed, the testimony of the putative alibi witnesses presented at the PCR hearing is wholly inconsistent with defendant's statement to the police that he also left his home on the evening of the shooting and walked around the neighborhood with his friends. See Gideon, 244 N.J. at 558-59 (explaining trial counsel's failure to call putative alibi witnesses was not ineffective in part because there was a conflict between defendant's version of the events and those of the witnesses).

In addition to not providing support for a viable alibi defense, the testimony of the putative alibi witnesses presented at the PCR hearing also

would have been accompanied by a risk to defendant recognized by trial counsel. That is, presentation of the alibi witnesses would have afforded the State with a reason and an opportunity to present Terry and Rowe as rebuttal witnesses and, based on trial counsel's unrefuted testimony at the PCR hearing, their testimony would have supported a claim defendant was criminally culpable for the charged offenses as an accomplice. See id. at 559 (finding trial counsel was not ineffective in part because calling putative alibi witnesses would have increased the likelihood of the defendant's conviction).

In sum, defendant did not present any evidence establishing a reasonable probability that but for counsel's alleged error in failing to call the three alibi witnesses at trial, the result of the trial would have been different. And, for the reasons noted, our consideration of the evidence presented at trial and the weaknesses of, and problems presented by the witnesses' putative alibi testimony, we discern no basis to conclude the PCR court erred by finding defendant failed to sustain his burden under Strickland's prejudice prong.

Because defendant did not satisfy his burden under either prong of the Strickland standard, the court correctly denied defendant's PCR petition. 466 U.S. at 687; Nash, 212 N.J. at 542. To the extent we have not expressly

addressed any arguments made on defendant's behalf, we find they are without sufficient merit to warrant discussion in this opinion.  R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0346-22